SHANENA BARNES & another[1] *vs.* METROPOLITAN HOUSING
ASSISTANCE PROGRAM.

Suffolk. March 6, 1997. - May 22, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & MARSHALL, JJ.

*Practice, Civil,* Report, Summary judgment. *Housing. Housing Court,*
Report. *Lead Poisoning. Public Policy. Contract,* Contract clause, Third
party beneficiary. *Massachusetts Tort Claims Act.*

The Metropolitan Housing Assistance Program (METHAP), a State public
housing agency administering the Section 8 Housing Assistance Program
of the United States Housing Act, 42 U.S.C. §§ 1437 et seq., owed no
contractual duty to tenants receiving rental subsidies to inspect to ensure
that the housing is maintained in a decent, safe and sanitary condition,
where the agency's contracts with the landlord had clauses explicitly
excluding METHAP's liability to third parties and where the Legislature
had enacted G. L. c. 258, § 10 (*f*), expressing its judgment that there was
no public policy favoring third-party liability of the Commonwealth
with respect to claims based on its alleged failure to inspect real
property for safety. [84-86]
In a civil action the plaintiff tenant did not demonstrate in materials in sup-
port of her motion for summary judgment that the State agency
administering a federally subsidized rental assistance program in which
the plaintiff participated had given her the "explicit and specific assur-
ance[ ] of safety," within the meaning of G. L. c. 258, § 10 (*j*) (1), that
would be necessary for the imposition of liability on the defendant State
agency for the lead poisoning of the tenant's child due to lead-based
paint ingestion in the premises leased under the program. [86-88]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 1, 1991.

On transfer to the Boston Division of the Housing Court
Department, a motion for summary judgment was heard by *E.
George Daher*, J., and the case was reported by him to the Ap-
peals Court. The Supreme Judicial Court on its own initiative
transferred the case.

*Mark P. Sutliff*, Assistant Attorney General (*Alice G. Winn*,
Assistant Attorney General, with him) for the defendant.

---

[1]Her mother and her next friend, Angela Barnes.

*Martin Kantrovitz* (*Tammi Tuve* with him) for the plaintiffs.

*Martin J. Rooney* for the Medford Housing Authority & another, amici curiae, submitted a brief.

FRIED, J. The plaintiffs, tenants in a federally subsidized rental assistance program, commenced an action against the Metropolitan Housing Assistance Program (METHAP), the State agency administering the program, for breach of its obligations to inspect for and provide safe housing. The plaintiffs allege that this breach led to lead poisoning of the minor plaintiff because of lead-based paint ingestion at the leased premises. A judge in the Boston Division of the Housing Court Department denied METHAP's motion for summary judgment. The parties filed a joint motion to request the judge to report his order and, in addition, to report certain underlying questions to the Appeals Court. The judge allowed the motion, and reported his ruling for a determination of its correctness. See Mass. R. Civ. P. 64, 365 Mass. 831 (1974). We transferred the case to this court on our own motion and vacate the denial of summary judgment.

I

The Federal government, through the United States Department of Housing and Urban Development (HUD), provides rental subsidies to low income tenants under the Section 8 Housing Assistance Program (HAP) of the United States Housing Act, 42 U.S.C. §§ 1437 et seq. (1994 & Supp. I 1995). The purpose of the act is to provide "decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437 (1994). This program is administered through agreement with HUD by State and local agencies (public housing agencies or PHAs). METHAP is one such local agency. Administration of HAP is the subject of Federal statutory and regulatory provisions with which these agencies must comply. In *Ayala* v. *Boston Hous. Auth.*, 404 Mass. 689, 696-697 (1989), we described the obligations of the PHA under Section 8 and its implementing regulations. For all relevant purposes they had not been changed at the time the contracts in this case were signed. These obligations include the obligation to inspect or to cause to be inspected the

premises before occupancy by a Section 8 tenant,[2] to assure that the unit is safe, to require the owner of the unit to make repairs before the owner receives a contract with the PHA, and to reinspect the unit on an annual basis thereafter. 24 C.F.R. §§ 882.209 (h)(1) and (2) (1990); 24 C.F.R. § 882.211 (b) (1990). The regulations specify that "immediate" lead paint hazards must be eliminated prior to occupancy. 24 C.F.R. § 35.24 (b)(2)(i) (1990). The regulations define such hazards as paint which "is cracking, scaling, chipping, peeling or loose" in housing constructed at a time when lead-based paint was commonly used. 24 C.F.R. § 22 (1990).

Under the Section 8 program, the PHA enters into a HUD approved contract with the owner, a housing assistance payments contract (HAP contract), and an annual contributions contract (AC contract) that set out the terms by which the PHA will make rental subsidy payments to the owner, and, among other things, obligate the owner to maintain the premises in a decent, safe, and sanitary condition. The tenant, having been approved by the PHA for participation in the program, executes a HUD prescribed lease with the owner. The lease obliges the owner to provide decent, safe, and sanitary housing in accordance with applicable HUD regulations and the State sanitary code and to make necessary repairs accordingly. This lease is signed by the tenant and owner. Additional provisions relating to other good cause termination of the tenancy by the owner, security deposits, and certain prohibited lease provisions are contained in an addendum, which provides that the PHA initial the addendum.

Barnes had applied to METHAP, and, after her eligibility was determined, housing search workers for the shelter where she was living with her children informed her of a vacancy. Prior to receiving housing, she attended a mandatory orientation program which informed her of the dangers of lead poisoning and advised her to have her children tested for lead poisoning every six months. At the completion of the program, she signed a HUD form entitled "Watch out for Lead Paint Poisoning." Angela Barnes's lease provided that the rent for the apartment in issue here would be $700 a month of which she would pay $39 and the balance would be

---

[2]We refer to a tenant receiving subsidized rent under Section 8 of the HAP as a "Section 8 tenant."

paid by the PHA. A METHAP inspector inspected the premises prior to the occupancy, which began in May, 1989. Barnes stated that the inspector checked for chipped or cracked paint, and that he stated that the apartment was "up to standard." Some months after moving in, the ceiling in her daughter's room "caved in" because of a leak in an upstairs apartment. METHAP insisted that repairs be made, and the owner eventually made some repairs, which METHAP inspected and approved. Barnes also testified that she had found chips of paint in the window areas and that paint chips would appear every time she opened the windows. About eighteen months after she moved in, an inspection revealed the need for extensive deleading, and, two months later, her two year old daughter was diagnosed as having elevated levels of lead in her blood. Because of these problems, the family quit the premises.

The plaintiffs brought this suit against METHAP, stating two distinct grounds. Count I states that METHAP "had a contractual relationship with the plaintiffs . . . obligat[ing it] to provide plaintiffs with safe, habitable and fit housing," and that the minor's lead poisoning was the result of METHAP's breach of its obligations. Count II states that METHAP "owe[d] a duty of reasonable care to the plaintiffs [to provide them with] leadfree housing and [to do] reasonable and appropriate lead inspections." The judge in the Housing Court ruled that, following our decision in *Ayala, supra*, METHAP was obligated to the plaintiffs as third-party beneficiaries of its HAP contract and AC contract with the owners to provide them with lead-free housing or at least to inspect and protect them against lead hazards. Although the HAP contract and the AC contract had clauses explicitly excluding METHAP's liability to third parties,[3] which the contracts in *Ayala* did not, the Housing Court held on the authority of *Ayala, supra*

---

[3]The HAP contract states:

> "Nothing in this Contract shall be construed as creating any right of the Family or other third party (other than HUD) to enforce any provision of this Contract, or to assert any claim against HUD, the PHA or the Owner under this Contract."

The AC contract states:

> "Nothing in the [AC contract] shall be construed as creating any right of any third party to enforce any provision of this [AC

at 701, that such exclusionary language was against public policy. The judge then considered the effect of G. L. c. 258, § 10, and especially § 10 (f), which was enacted in 1993. The judge stated that he had "no doubt that the Legislature, in adopting [§ 10 (f)] sought to overturn the *Ayala* decision."[4] Nevertheless, the judge declined to give the legislation retroactive effect, because he found that METHAP's contractual duties to the plaintiffs had vested prior to the enactment and the contract clause of the United States Constitution, art. 10, § 1, subjects "a state-created impairment of its own obligations . . . to strict constitutional scrutiny," which it cannot survive.[5]

As to plaintiffs' second count, "in looking at the document provided by the plaintiffs, the [judge ruled that he] cannot find that explicit and specific assurance, as defined in G. L. c. 258, § 10 (j) (1)," which would be necessary to impose liability on METHAP for breach of its duty to the plaintiffs apart from any contractual obligation.

The judge denied summary judgment, stating that he was "not finding that the statute as applied is unconstitutional."[6] The judge then reported his order to the Appeals Court to

---

contract], or to assert any claim against HUD or the PHA under this [AC contract]."

[4]General Laws c. 258, § 10, states:

"The provisions of sections one to eight, inclusive, shall not apply to: — . . . (f) any claim based upon the failure to inspect, or an inadequate or negligent inspection, of any property, real or personal, to determine whether the property complies with or violates any law, regulation, ordinance or code, or contains a hazard to health or safety, except as otherwise provided in clause (1) of subparagraph (j)."

[5]After a second briefing, the judge modified this language to state that "[t]he regulation of state contracts is subject to more strict scrutiny than the regulation of completely private contracts." The judge did go on, however, to state that only a "compelling state interest" would justify a retroactive abandonment of the State's own contractual obligations.

[6]The judge apparently concluded that the statute would be unconstitutional as applied only if the plaintiffs were able to convince "a jury that they reasonably relied upon [the contracts] to their detriment because the Dwelling Lease Agreement incorporated by reference the HUD regula-

determine its correctness. The judge also reported six questions to the Appeals Court. A trial judge, unlike a single justice of this court, may not report a question of law in a civil action, but may, in the circumstances described in Mass. R. Civ. P. 64, report the propriety of a ruling or an order as the judge did here. In such cases, we disregard the questions and evaluate the propriety of the ruling or order. See *Jacobson* v. *Mailboxes Etc. U.S.A., Inc.*, 419 Mass. 572, 574 n.4 (1995); *Roberts* v. *Worcester*, 416 Mass. 804, 805 n.3 (1994).

## II

### A

METHAP owed no contractual duty to the plaintiffs. The Housing Court judge and the plaintiffs rely on our decision in the *Ayala* case for the proposition that Section 8 tenants are the intended beneficiaries of the contracts that public agencies like METHAP make with landlords to provide "decent, safe, and sanitary dwellings" — that include dwellings free from lead-based paint hazards. In *Ayala*, the local agency administering the HAP was the Boston Housing Authority (BHA), which had failed to inspect for lead paint hazards the premises it approved for the plaintiffs' use. The BHA was obligated by its contract with the owner to inspect the premises to make certain that it posed no lead paint hazard. We held that Section 8 tenants were intended third-party beneficiaries of this contractual obligation:

> "Recognizing a right to enforce these promises against the BHA 'is appropriate to effectuate the intention of the parties.' *Flattery* v. *Gregory*, 397 Mass. 143, 148 (1986). . . . When faced with liability for breach of its contractual duty to inspect for, and oversee the remedying of, lead paint hazards, the BHA will have a strong incentive to achieve the goals of the Federal statutes and regulations. We conclude also that HUD, the promisee, intended the plaintiffs to benefit. *Id.* To rule that these plaintiffs were not intended beneficiaries would mock

tions." He concluded that at trial METHAP would be "permitted to introduce [the exclusionary clauses in the AC and HAP contracts] for·the limited purpose of showing or attempting to show that the plaintiff[s] did not rely upon the contract."

the very goals which Congress and HUD set out to achieve through the Section 8 program, at least as to the lead paint provision: to afford children of families of meager means a decent, safe, and sanitary place to live."

*Ayala, supra* at 700-701. But the contract in *Ayala* did not contain the exclusionary clause which was present here. The Housing Court, however, relied on *Ayala* to void that clause as against public policy. The judge held that the same considerations that led us to imply such an obligation in the contract in *Ayala* also rendered void as against public policy any attempt to exclude such an implication. The difficulty with this line of reasoning, which the plaintiffs repeat to us here, is that the Legislature, in enacting G. L. c. 258, § 10 (*f*), undertook to negate the doctrine of the *Ayala* case, and implicitly expressed its conclusion, which we are bound to follow, that no such public policy exists.[7] The exclusion of § 10 (*f*) is subject to the saving provision of § 10 (*j*) (1), by which an "explicit and specific assurance[] of safety [is] made to the direct victim or a member of his family." Whether or not the obligations stated in the AC contract are sufficiently explicit and specific, they most certainly are not made to the direct victim.

In order to reinstate the third-party contractual obligation to the plaintiffs, the Housing Court and the plaintiffs have recourse to the contract clause of the United States Constitution. The plaintiffs argue that the Legislature's judgment of public policy expressed in § 10 (*f*), which was enacted after the contracts in this case were signed, may not be used to deprive the plaintiffs of relief because to do so would allow the State retroactively to alter its contractual obligations. It is not accurate to say, as the Housing Court did, that retroactive adjustments by the State of its contractual obligations must be subject to strict scrutiny.[8] But this inaccuracy is beside the point. In order to reach the conclusion that § 10 (*f*) retroactively affected METHAP's contractual obligation

[7]It appears that another Housing Court judge in Parks *v.* Petraglia, Housing Ct. No. 93-CV-00155 (Jan. 20, 1995), opined that the Legislature undertook not to disapprove *Ayala* v. *Boston Hous. Auth.*, 404 Mass. 689 (1989), but to confirm it. Because the case is unreported we do not comment on its reasoning, but disagree with that conclusion.

[8]The leading United States Supreme Court case on this issue indicates that the Court subjects retroactive altering of a State's own obligation to

to the plaintiffs, the Housing Court had first to impose that implicit contractual obligation in the teeth of the very explicit exclusionary clauses. At the time that it entered into the contract with the owner, METHAP made as explicit as possible that it was undertaking no contractual obligations to persons in the plaintiffs' situation and that it intended no third-party beneficiaries to that contract. Quite clearly, any such obligation would be imposed by the court in spite of, not because of, the contract. When the Legislature enacted § 10 (*f*), expressing its judgment that there was no public policy favoring third-party contractual liability, it was only confirming the understanding METHAP reasonably believed it had already achieved through the exclusionary clauses in the contracts.[9] There is, therefore, not the kind of retroactive varying of a State's contractual obligation to which the contract clause is addressed. Cf. *General Motors Corp.* v. *Romein*, 503 U.S. 181 (1992) (no contract clause violation where Legislature enacted statute repudiating State Supreme Court's interpretation of earlier statute, with effect of increasing private employers' obligations to pay compensation benefits under employment contracts).

B

There remains the claim, implicit in Count II of the plaintiffs' complaint, that, quite apart from any contractual obligation to the plaintiffs as third-party beneficiaries to the

---

heightened scrutiny, but that that heightened review is not stated to rise to the level of strict scrutiny:

> "The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional *if it is reasonable and necessary to serve an important public purpose.* In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. . . . If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." (Emphasis supplied and footnotes omitted.)

*United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 25-26 (1977).

[9]The judge conceded that "[i]t is clear that as to the future, the Legislature . . . has changed that public policy."

AC contract, the defendant "made to the direct victim or a member of [her] family" the kind of "explicit and specific assurance[] of safety" that the Legislature in G. L. c. 258, § 10 (*j*) (1), allowed to survive as a basis for tort liability. We recently considered this provision in *Lawrence* v. *Cambridge*, 422 Mass. 406 (1996), where we allowed a claim based on such an assurance of safety to survive the defendant's motion for summary judgment based on the plaintiff's affidavit that "the Cambridge Police promised to protect [the plaintiff] when [he] closed the store at night." *Id.* at 407. To satisfy the conditions of § 10 (*j*) (1), we held that there must be "a spoken or written assurance, not one implied from the conduct of the parties or the situation [and that] the terms of the assurance must be definite, fixed, and free from ambiguity." *Id.* at 410. The contract with the owner does not meet the requirements of § 10 (*j*) (1) if for no other reason because such assurances as it may contain are not "made to the direct victim or a member of [her] family." The only other materials the plaintiffs offer to meet the requirements of § 10 (*j*) (1) are contained in Barnes's deposition. She testified that it was her "understanding" that the METHAP inspector "checked to see if there was chipped and cracked paint," that it was her "recollection that . . . the unit was up to standard and passed it . . . [a]nd that meant that [she was] able to move into it." She further testified in her deposition that, after the ceiling collapse and repairs, METHAP sent another inspector "to make sure that the work was done" and that "the inspector found that the apartment now passed."[10] This is not enough to meet the requirements of the statute. It is not an explicit and specific assurance that the premises are free of lead paint hazards. Rather, it is the sort of assurance "implied from the conduct of the parties or the situation," that we have held does not meet the requirements of the statute. *Lawrence* v. *Cambridge*, *supra*. We would fail to respect the intent of the Legislature to make § 10 (*j*) (1) apply to the truly exceptional case where direct and explicit assurances are given to a particular person quite apart from the normal carrying out of officials' routine duties if we allowed statements such as these to pass the bar of summary judgment. Accordingly, we conclude that the second count in the plaintiffs'

---

[10]The words are actually those of her attorney, as he posed questions to which she answered affirmatively.

claim should also be dismissed. The dismissal should be without prejudice, so that the Housing Court may, in its discretion, allow the plaintiffs to offer additional affidavits or other materials that may satisfy the standard we set out here for overcoming a motion for summary judgment.

The order of the Housing Court denying summary judgment with respect to Count I is vacated. In respect to Count II, the case is remanded to that court for further proceedings in accordance with this opinion.

*So ordered.*