Garsh, J.
Jeffrey Heaberlin brings this action as administrator of the estate of his son, Robert Heaberlin. Robert Heaberlin died on June 12, 1996 while in the care of Eileen Sousa,[3] a foster parent. Now before the court is the Fall River Department of Social Services’ motion for summary judgment. For the following reasons, the court ALLOWS the defendant’s motion.
BACKGROUND
When viewed in the light most favorable to the plaintiff, the record reveals the following facts.
On April 10, 1996, the Fall River Department of Social Services (“DSS”) placed Robert Heaberlin (“Robert”), along with his brother, in the home of Eileen Sousa (“Sousa”). Robert’s sister was already in a preadoptive home. At the time, Robert was eight years old. Prior to Robert being placed in foster care, Jeffrey Heaberlin (“Heaberlin”) was told by an unidentified representative of the Department of Social Services that Robert would be taken care of with regard to his well-being, including clothes, food and medical care.
After receiving an individual’s application .to be a foster parent, DSS conducts a “home study.” If the home is approved, “An Agreement between the Massachusetts Department of Social Services and Foster Parents” (the “Agreement”) is entered. The foster parent agrees with DSS to “provide a safe, nurturing and stable environment that is free from abuse and neglect." DSS agrees with the foster parent to assign a social worker who is responsible for providing the foster child with services. The foster parent agrees to schedule appointments for the child’s routine health care and to arrange for emergency medical treatment when necessary.
The Commonwealth also agrees to provide a “Medical Passport” to foster parents and the foster parent agrees to “hold the child’s Medical Passport.” The Medical Passport includes, in part, a list of all the childhood diseases that the foster child has had. DSS did not provide Sousa with Robert’s Medical Passport.
DSS also agrees to provide the foster parent with relevant training programs. The training program used by DSS is a nationally recognized education program to prepare and assess prospective foster and adoptive parents. It is the most widely used and accepted foster parent training curriculum. It is used by twelve other states, a number of individual counties within other states, and internationally as well. The training focuses on educating foster and adoptive parents how to handle special problems associated with foster and adoptive children, such as neglect, abuse, and feelings of loss following separation from natural parents or prior foster homes. DSS does not require foster parents to have training in CPR or First Aid. DSS does not offer these courses nor does it offer instruction on disease recognition.[4] The training provided by DSS does not include specific instruction on childhood diseases, nor on the recognition of symptoms to diagnose such diseases.
Sousa is married and has three grown children of her own and a stepson. Sousa received training on how to handle a foster child’s behavior. Since the mid-1970s, she has had over two hundred and seventy-five foster children placed in her home. Sousa has dealt with various medical problems in caring for these children.
Sousa had a great deal of experience with chicken pox. She had other foster children in the past who had *283 chicken pox, and Sousa’s natural children also had chicken pox. One summer, she had six children with chicken pox. Before this incident, Sousa had heard of meningitis and knew that it was serious, but did not know anyone who had contracted the disease. The disease is rare.
On June 6, 1996, a technician at St. Anne’s Hospital in Fall River, where Robert was being tested for reasons unrelated to the meningitis that caused his death, noticed purple spots on Robert’s body. Sousa was with him at this time.
On June 11, 1996, Sousa kept Robert home from school. He had a temperature of 101 degrees. There is evidence in the record that Sousa believed that Robert had chicken pox for three days prior to his hospital admission on the morning of June 12, 1996. There is also evidence in the record that Robert had a rash on his trunk and armpits for one to two days prior to his hospital admission.
A purple rash is a classic symptom and hallmark of meningitis. A 101 degree temperature is another symptom of meningitis. The purple rash which is a symptom of meningitis is an entirely different color and shape from chicken pox. Chicken pox are characterized by spots whereas meningitis is characterized by a rash.
On June 11, 1996, Sousa called St. Anne’s hospital to verify the presence of chicken pox in the area and was told by a person in the Emergency Room that it was. She told the person she spoke with about Robert’s morning fever. The person told her not to worry. Sousa asked if the treatment was still to keep the child clean and to use Calamine lotion. The hospital told her that it was, and also advised her to use Children’s Tylenol.
Sousa also spoke with Heaberlin who told her that Robert had had chicken pox before. Rarely does one contract chicken pox more than once in a lifetime.
Robert only “picked” at his supper on the evening of June 11, 1996. Between 3:30 and 4:00 A.M. the next morning, Sousa discovered that Robert had soiled himself. As he felt warm, Sousa gave him a cool bath; after his bath, his temperature registered 102. Sousa did not see any spots other than the ones which had been visible to her the night before.
When, thirty minutes later, Robert said that he was freezing and that his wrist hurt, Sousa believed that Robert might have Lyme disease or encephalitis. She called "911" at 5:56 A.M., and an ambulance arrived six minutes later. When the ambulance arrived, Robert was in respiratory distress. Sousa told the firefighter who arrived that Robert was having trouble breathing and that he had chicken pox.
Robert was placed into an ambulance where he went into full cardiac arrest. An emergency technician attempted to get Robert breathing again, but his condition deteriorated quickly. By 6:13 A.M., his breathing rate went down to zero. The hospital staff in Fall River transferred him to Rhode Island Hospital after diagnosing him with meningitis. By 8:30 A.M., Robert’s body was “all purple,” including his feet. Prior to the transfer, the hospital staff was able to get a pulse from Robert.
After being transported to Rhode Island Hospital, Robert died of meningitis and shock at 2:47 P.M. At the time of his arrival at Rhode Island Hospital, Robert had massive purpurea, or a purple rash, on his body. The purpurea which Robert had on his body on the day of his death looked nothing like chicken pox. Chicken pox are raised, and the blotches on Robert’s body were not raised. Chicken pox looks like a blister, almost like a boil. Robert’s skin was not blistered; the blotches were flat on his skin. Chicken pox are usually itchy. There were no signs that the blotches or spots on Robert’s skin had been scratched.
Robert probably would have exhibited additional symptoms of meningitis, other than the rash, as early as twelve to twenty-four hours prior to the time when emergency medical attention was first sought by Sousa. These symptoms include lethargy and confusion, severe headaches and neck pain. Had medical treatment been sought twelve to twenty-four hours earlier than when it was sought, Robert probably would have survived. Sousa was not responsible in any way for Robert’s becoming infected with meningitis.
DISCUSSION
The complaint seeks damages from DSS for Robert’s wrongful death brought about by the negligence of Sousa (Count 2) and the negligence of DSS (Count 4). More specifically, the alleged negligence consists of the following:
1) Sousa’s disregard for the early symptoms of meningitis and her failure to obtain prompt and adequate medical attention for Robert;
2) DSS’ failure to provide Sousa with training and education on childhood diseases and severe medical problems, including their identification and treatment; and
3) DSS’ hiring, supervision, and training of the social worker assigned to Sousa and Robert.
DSS maintains that, under the Tort Claims Act, it is immune from liability because neither DSS nor anyone acting on its behalf “originally caused” Robert to develop meningitis.[5] G.L.c. 258, §10(j).
Section 10(j) of the Tort Claims Act aims “to provide some substantial measure of immunity from tort liability to government employers.” Brum v. Town of Dartmouth, 428 Mass. 684, 695 (1999). That section of chapter 258 provides immunity from:
any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.
*284 G.L.c. 258, §10(j). The grant of immunity, however, does not apply to any of the following types of claims:
any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances . . .
any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and . . .
any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee.
G.L.c. 258, §10(j)(1), (2), (4).
Heaberlin does not claim that, but for Robert being in Sousa’s care, Robert would not have developed meningitis. Rather, the thrust of the complaint is that, but for the negligence of DSS and Sousa, Robert would have received treatment for meningitis more quickly and, therefore, would have survived. In Brum, the Supreme Judicial Court interpreted Section 10(j) to immunize a town from liability for a student’s death brought about by a stabbing at school because the town’s failure to provide security was deemed not to have “originally caused” the stabbing, despite the fact that the killing came about because the town failed to prevent it. Brum, 428 Mass. at 692. The Court rejected an expansive reading of the phrase “originally caused” in order to avoid every negligent failure to prevent a condition or situation from giving rise to liability notwithstanding Section 10(j). Id. at 693. “Thus, there is immunity in respect to all consequences except where ‘the condition or situation’ was ‘originally caused by the public employer.’ ” Id. at 692. Therefore, even if DSS or Sousa negligently failed to act to diminish the harmful consequences of the meningitis contracted by Robert, Section 10(j) provides immunity because neither DSS nor Sousa “originally caused” Robert’s illness. None of Heaberlin’s arguments to the contrary are persuasive.
Relying upon language in Brum to the effect that “the principle purpose of §10(j) is to preclude liability for failures to prevent or dimmish harm, including harm brought about by a third party,” id. at 696, Heaberlin argues that Section 10(j) offers immunity only if the harm at issue has been brought about by the act of a third person. See also Serrell v. Franklin County, 47 Mass.App.Ct. 400, 403 (1999) (“the [appellate] cases to date construing §10(j) and holding it a bar to tort liability involve fact patterns where a third party, not the governmental actor, directly harmed the plaintiff’). Since it is not contended that Robert fell ill with meningitis as a result of the violent or tortious conduct of a third person, Heaberlin maintains that Section 10(j) is inapplicable. The appellate courts have not, however, purported to restrict application of Section 10(j) to harm brought about by a third party.
Indeed, the plain text of Section 10(j) militates against the restrictive reading urged by Heaberlin. “The ‘including’ clause [in Section 10(j)] must modify the noun "consequences," rather than the nearer nouns ‘condition’ or ‘situation,’ because conduct cannot grammatically or logically constitute ‘a condition or situation.’ Thus, there is immunity in respect to all consequences except where ‘the condition or situation’ was ‘originally caused by the public employer.’ “ Brum, 428 Mass. at 692 (emphasis added). Nowhere in its decision does the Court conclude that the phrase "including the violent or tortious conduct of a third person" confers immunity only to claims of harmful consequences arising from the conduct of a third person. Should the “including” clause be so limited, it would leave public employers potentially liable for negligent acts or omissions which fail or prevent or diminish the harmful consequences of many conditions or situations, such as those flowing from a natural disaster, self-inflicted harm, or animal behavior.[6] Given the statute’s purpose, it is highly unlikely that the Legislature intended the “including” clause to be one of such narrow limitation. Accordingly, the “including” clause in Section 10(j) is not a limitation which precludes immunity here merely because Robert’s meningitis was not the result of the conduct of a third person.
Heaberlin next makes the related argument that an illness, such as meningitis, is not a “condition or situation” within the meaning of G.L.c. 258, §10(j). The text of the statute contains no such limitation. To construe, as Heaberlin urges, the word “condition” as excluding any medical condition would violate the principle of statutory construction that words in a statute should be accorded their common meaning. Pyle v. School Comm. of S. Hadley, 423 Mass. 283, 286 (1996). The common meaning of “condition” certainly encompasses the state of being physically ill. See American Heritage Dictionary 393 (3d ed. 1996) (defining “condition” as "a mode or state of being... a state of health... a state of readiness or physical fitness ... a disease or physical ailment...”). There is no reason to assume that the Legislature intended the term “condition” to be given a construction different from its plain and ordinary meaning. To the contrary, Section 10(j) itself contains an exception for claims by patients for negligent medical or other therapeutic treatment, G.L.c. 258, §10(j)(4), which would be rendered superfluous if the term “condition” did not encompass a medical condition.
Relying upon the fact that the Court in Bonnie W. v. Commonwealth, 419 Mass. 122, 126-28 (1994), held that some of the claims in that action should have survived a summary judgment motion, Heaberlin contends that his negligence claims must survive as well. His argument overlooks the fact that there is no evidence here of an affirmative act undertaken by DSS or its agent which would remove this action from the protective ambit of Section 10(j).[7]
*285 The plaintiff in Bonnie W. was sexually assaulted during a parolee’s employment at a park. Id. at 125. She advanced two significantly different theories of negligence, namely negligent supervision of a parolee and the negligent recommendation of that parolee’s continued employment at a trailer park and the giving of incorrect information in support of that recommendation resulting in the parolee’s having access to the plaintiff inside her mobile home. The Supreme Judicial Court held that the negligent supervision theory was barred by G.L.c. 258, §10Q). The second claim, based on the alleged negligent activity of a parole officer after parole was granted, survived because it was based upon “an affirmative act. . . that created a situation in which a sexual predator held a job giving him access to the keys to every trailer in the park.” Brum, 428 Mass. at 695.
This record, by contrast, contains no similar evidence of a wrongful affirmative act. Heaberlin does not claim that the placement of Robert in Sousa’s home resulted in any way in Robert becoming infected with meningitis.
Therefore, the exception to the grant of immunity contained in G.L.c. 258, §10(j)(2), 'applicable if the claim is based upon the “intervention of a public employee which causes injury to the victim” or which “places the victim in a worse position than he was in before the intervention” does not save Heaberlin’s claim. There is nothing in this record that would support a finding of an affirmative act of intervention that caused Robert to contract meningitis or placed him in a worse position than he was before the intervention. Cf. Bonnie W. v. Commonwealth, 419 Mass. at 127 (public employer negligently recommended parolee’s employment and gave employer misleading information in support of recommendation); Serrell, 47 Mass.App.Ct. at 405 (summary judgment not warranted where prison visitor’s injuries stemmed from the affirmative action of the intervening correctional officers and where the plaintiff produced evidence “that the officers’ intervention exacerbated the situation to her detriment and, ultimately, her harm”).
Heaberlin also maintains that the exception for explicit and specific assurances of safety or assistance, G.L.c. 258, §10(j)(1), allows his action to survive. That exception has three prerequisites, namely that the representation be “explicit and specific . . . beyond general representations that investigation or assistance will be or has been undertaken,” that the representation be made to the direct victim or a member of his family or household, and, finally, that the injury result, in part, from reliance on those assurances. Witih respect to the alleged oral representation made by an unnamed representative of DSS,[8] Heaberlin fails to meet the first and third prerequisites.[9]
A representation that a child being placed in foster care will be taken care of with regard to his well-being, including medical care, is far too general to satisfy the specificity requirement in subsection 10(j)(1). “[B]y ‘specific’ the terms of the assurance must be definite, fixed and free from ambiguity.” Lawrence v. City of Cambridge, 422 Mass. 406, 410 (1996). The representation alleged by Heaberlin is no more than a general representation concerning Robert’s care and protection and cannot be stretched to mean that DSS promised Heaberlin that the foster parent caring for Robert would receive special training in the recognition of rare diseases such as meningitis. This court “would fail to respect the intent of the Legislature to make §10(j)(1) apply to the truly exceptional case where direct and explicit assurances are given to a particular person quite apart from the normal carrying out of officials’ routine duties if [it] allowed statements such as these to pass the bar of summary judgment.” Barnes v. Metropolitan Housing Assistance Program, 425 Mass. 79, 87 (1997). Compare Lawrence, 422 Mass. at 410 (genuine issue of material fact whether a police department’s promise was explicit and specific where, following plaintiff s agreement to testify at a grand jury hearing against his assailants, including a known dangerous individual, the police agreed to protect the plaintiff when he closed his store at night).[10] The requisite specificity also cannot be supplied by the situation, namely the placement of a child in foster care. Id. (“by ‘explicit’ the Legislature meant a spoken or written assurance, not one implied from the conduct of the parties or the situation’’).[11]
Moreover, unlike the recipient of the representation in Lawrence, who submitted an affidavit asserting that in returning to work he relied on the police department’s promise, id. at 407, Heaberlin’s affidavit does not state that he relied in any way upon the representation made to him by DSS, and the record does not demonstrate that any injury flowed from such reliance. On this record, such reliance cannot be assumed; nor can it be assumed that, but for the fact of the representation, Robert would not have been placed in foster care in Sousa’s home.[12] Thus, Heaberlin cannot take advantage of G.L.c. 258, §10(j)(1).
Heaberlin’s final argument is that since foster children are “committed to [DSS]” pursuant to G.L.c. 119, §24, a “special relationship” exists between the Commonwealth and foster children, permitting a suit for negligence in connection with the foster child relationship to be maintained. However, there is nothing in G.L.c. 119, §24 that constitutes a waiver of sovereign immunity in connection with actions alleging negligence by a foster parent or negligence by DSS in connection with the foster care program.
Heaberlin analogizes foster children to incarcerated prisoners and persons involuntarily committed to mental facilities whose relationship to the state gives rise to a duty of adequate protective services. See, e.g., DeShaney v. Winnebago County Dep’t of Social Services, 489 U.S. 189, 198-00 (1989). In those circumstances, however, it is the Constitution that imposes the duty of care. Id. at 200. The immunity afforded by the Massachusetts Tort Claims Act cannot, of course, *286 bar a cause of action based upon violation of a duty of care imposed by the Constitution. But there is no authority for this court to create a common law public duty rule that would permit negligence actions to proceed despite Section 10(j) whenever a “special relationship” exists. See Bonnie W., 419 Mass. at 126 (“G.L.c. 258, § 10 [is] the only public duty rule we shall now apply. We do not intend to have applicable both the legislated public duty rule and a common law public duty rule that might be applicable when the legislative public duty rule is inapplicable”).
Rather than supporting his argument that the “special relationship” between the Commonwealth and Robert should allow Heaberlin to proceed on his common law negligence claims, Brum favors precisely the opposite result. In Brum, the Court analyzed whether there was a “special relationship” between a governmental unit and school children that gave rise to a duty of care only in connection with its discussion of the. plaintiffs claims under 42 U.S.C. §1983. Brum, 428 Mass. at 697-05. The legal impact of the possibility of there being a “special relationship” was not discussed in the chapter 258 analysis. Id. at 691-96.
Heaberlin has not brought any constitutional claims here. Accordingly, any “special relationship” that may have been created by G.L.c. 119, §24 is not sufficient to exempt this negligence action from the ambit of G.L.c. 258, §10(j). The task for this court is to interpret and apply G.L.c. 258, §10(j), not to create exceptions the Legislature has chosen not to include.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Fall River Department of Social Services’ motion for summary judgment is ALLOWED and that JUDGMENT shall enter in favor of the Fall River Department of Social Services dismissing the plaintiff s claims against it.

 On October 17, 2000, this court (Murphy, J.) granted Eileen Sousa’s motion for judgment on the pleadings with respect to all counts against her on the grounds that she is a public employee for purposes of this case and, therefore, immune from liability.

 There is no evidence in the record that any state provides training to foster parents in the recognition of meningitis symptoms.

 DSS also argues that no evidence exists which could support any finding of negligence or duty on the part of DSS or Sousa. Disputed material facts, however, preclude the entry of summary judgment dismissing the complaint on this ground. It is, for example, disputed whether Sousa was aware that Robert previously had had chicken pox and when Robert first displayed symptoms of meningitis entirely different from chicken pox, an illness with which Sousa was familiar. Furthermore, an assurance of safety by DSS which may not be of a type that would permit the plaintiff to maintain a suit against a public employer may nonetheless be probative as to whether DSS breached a duty of care owed to Robert.

 Several Superior Court justices have construed G.L.c. 258, §10(j) as immunizing a public employer from liability even when there is no violent or tortious conduct of a third person. It has, for example, frequently been the basis for immunity when the harm at issue resulted from the conduct of an animal. See, e.g., Coughlin v. Hanson, Civil Action No. 00-1161A, 12 Mass. L. Rptr. 447, 448, 2000 WL 1584856, at *2 (Worcester Super.Ct. 2000) (Toomey, J.); Kelly v. City of Cambridge, Civil Action No. 96-02877, 11 Mass. L. Rptr. 131, 132, 1999 WL 1411348, at *2 (Middlesex Super.Ct. 1999) (Fahey, J.); Moores v. Callahan, Civil Action No. 96-0972A, 10 Mass. L. Rptr. 743, 744, 1999 WL 1295109, at *2 (Plymouth Super.Ct. 1999) (Hely, J.); Cooper v. Somerville Hous. Auth., Civil Action No. 98-5274, 10 Mass. L. Rptr. 410, 411-12, 1999 WL 753386, at *2 (Middlesex Super.Ct. 1999) (Sosman, J.). In other contexts, as well, Section 10(j) has been held to provide immunity in the absence of any conduct of a third person. E.g., Jacome v. Commonwealth, Civil Action No. 99-3709E, at 3-4 (Suffolk Super Ct. 2000) (King, J.) (minor drowned at public beach); Hardy v. City of Somerville, Civil Action No. 94-2979, 3 Mass. L. Rptr. 158, 160, 1994 WL 878797, at *4 (Middlesex Super. Ct. 1994) (Bohn, J.) (self-inflicted intoxication).

 Heaberlin’s argument that DSS cannot take advantage of the discretionary function exception, G.L.c. 258, §10(b), also in reliance on Bonnie W., 419 Mass, at 127, is not addressed because DSS has not argued that § 10(b) entitles it to summary judgment.

 Plaintiff s failure to identify the DSS employee who made the alleged representation “may cast doubt on the factual accuracy of his claim,” but is an insufficient basis on which to grant summary judgment in favor of the Commonwealth. Lawrence v. City of Cambridge, 422 Mass. 406, 410 (1996).

 To the extent that Heaberlin seeks to come within Section 10(j)(1) based upon the assertions in the Agreement regarding the provision of a medical passport to a foster parent and a foster parent’s obligation to arrange for emergency medical treatment when necessary, he cannot. Not only is there no evidence in the record that Heaberlin relied upon statements in the Agreement, there is no evidence that he ever saw it and thus no evidence that any representation in the Agreement was made to him directly. Even if Heaberlin or Robert could be deemed to be a third-party beneficiary of the Agreement, that status is insufficient to satisfy the statutory requirement that the representation actually be made to the direct victim or a member of his family or household. See Barnes v. Metropolitan Hous. Assistance Program, 425 Mass. 79, 85 (1997).

 In Lawrence, the Court pointed out that the promise must be taken to refer only to protection in respect to the particular assault that gave rise to the representation and not to extend generally to protecting the plaintiff “from a disgruntled fellow employee or person carrying a grudge because of some personal relationship.” Lawrence, 422 Mass. at 412.

 See also Lamare v. Commonwealth, Civil Action No. 92-6343, 1994 WL 879863, at *1 (Super.Ct. 1994).

 See generally G.L.c. 119, §24. According to the facts in the record, objected to on the grounds of relevancy but not disputed, on February 21, 1996, a 51A report was filed when a man overdosed on heroin and died in Heaberlin’s apartment. DSS asked Heaberlin to submit to random urine screens for drugs, and he refused. On April 9, 1996, another 51A report was made after Heaberlin was seen in the emergency room of St. Anne’s Hospital where he arrived by ambulance after collapsing. Heaberlin admitted to alcohol intoxication, but denied drug use. On April 10, 1996, the hospital reported that it had found alcohol, heroin, and marijuana in Heaberlin’s system. On the same day, Robert, along with a sibling, was placed in Sousa’s home. The record also reflects that both Robert and his brother had been in foster homes before.