## QUANDRA CAMPBELL *vs.* BOSTON HOUSING AUTHORITY.

Suffolk. January 4, 2005. - March 4, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Lead Poisoning. Constitutional Law,* Contract clause. *Statute,* Retroactive application. *Housing. Housing Authority. Massachusetts Tort Claims Act. Contract,* Parties, Third party beneficiary.

In an action brought by the plaintiff, a former tenant in two federally subsidized residential assistance programs, against the Boston Housing Authority (authority) (the public entity that received and administered the rental subsidies under the two programs), seeking damages for injuries the plaintiff allegedly sustained from lead-based paint inhalation or ingestion when she resided at the leased premises from 1977 to 1981, the judge erred in granting summary judgment in favor of the authority on the plaintiff's contract claims on the basis that the exemptions set forth in 1994 amendments to the Massachusetts Tort Claims Act (specifically, G. L. c. 258, § 10 [*f*] and [*j*]) rendered the authority immune from suit, where retroactive application of the 1994 amendments substantially impaired an enforceable contractual obligation owed by the authority to the plaintiff (an intended third party beneficiary of the program contracts with respect to the authority's obligation to inspect the premises for lead hazards), in violation of the contract clause of the United States Constitution, and where the authority failed to demonstrate that such an impairment was reasonable and necessary. [581-584]

In an action brought against the Boston Housing Authority (authority) by the plaintiff, a former tenant, seeking damages for injuries the plaintiff allegedly sustained from lead-based paint inhalation or ingestion when she resided at the leased premises, the judge correctly granted summary judgment in favor of the authority on the plaintiff's negligence claim, where the authority's various generalized verbal assurances about the condition of the leased premises were not the kind of "explicit and specific assurances of safety or assistance" such as would destroy the authority's immunity from suit under § 10 (*f*) of G. L. c. 258, the Massachusetts Tort Claims Act. [585-586]

CIVIL ACTION commenced in the Boston Division of the Housing Court Department on June 10, 1998.

The case was heard by *Jeffrey M. Winik*, J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Theodore R. Whittenburg* for the plaintiff.

*Richard R. Eurich* (*Richard W. Jensen* with him) for the defendant.

GREANEY, J. The plaintiff, a former tenant in two federally subsidized rental assistance programs, commenced an action against the defendant Boston Housing Authority (BHA), the public entity that received and administered the rental subsidies under the two programs, seeking damages for injuries she alleged to have sustained from lead-based paint inhalation or ingestion at the leased premises. Asserting both negligence and breach of contract claims, the plaintiff alleged that the BHA, with respect to both tenancies, breached its duty to inspect for the presence of immediate lead hazards and failed to enforce proper elimination of the lead hazards and, with respect to the first tenancy, failed to ascertain that all required certifications pertaining to lead paint had been issued and were valid. A judge in the Boston Division of the Housing Court Department allowed the BHA's motion for summary judgment, and judgment entered dismissing all claims against the BHA.[1] The plaintiff appealed. We transferred the case here on our own motion and deem the appeal appropriate for decision, despite other pending claims, because of the important issues involved. See Mass. R. Civ. P. 54, 365 Mass. 820 (1974). We conclude that the judge erred in allowing summary judgment on the plaintiff's contract claims. We vacate the judgment in part and remand the case to the Housing Court for further proceedings.

The material undisputed facts, for purposes of the motion, are as follows.[2] The plaintiff was born on July 16, 1977. Along

[1] In her complaint, the plaintiff also asserted claims against the owners of the leased premises. The Boston Housing Authority's (BHA's) motion for summary judgment, and resulting order and judgment before us for review, pertained only to the claims against the BHA.

[2] While the judge accepted many alleged facts as true for purposes of summary judgment, all facts will have to be proved at trial.

with her mother, the plaintiff resided at 90 Capen Street in the Dorchester section of Boston from 1977 until 1979. Thereafter, from 1979 to 1981, the plaintiff and her mother resided at 9 Warner Street, also in Dorchester. Both residences were privately owned housing units.

The BHA received funds from the Federal government and subsidized the rent of the plaintiff's family at the Capen Street and Warner Street residences. With respect to the Capen Street tenancy, the BHA subsidized the plaintiff's family's rent pursuant to the provisions of the then applicable Section 23 Public Housing Leasing Program of the United States Housing Act of 1937, 42 U.S.C. § 1421 (b) (Section 23 program). Regarding the Warner Street tenancy, the BHA subsidized the plaintiff's family's rent pursuant to the provisions of the then applicable Section 8 Housing Assistance Program of the United States Housing Act, 42 U.S.C. §§ 1437 et seq. (Section 8 program). To receive the funds to participate in both the Section 23 and Section 8 programs, the BHA entered into Annual Contributions Contracts (AC contracts) with the United States Department of Housing and Urban Development (HUD), and Housing Assistance Payments contracts (HAP contracts) with the owners of the subject housing units. Both the Section 23 and Section 8 programs imposed contractual and regulatory obligations on the BHA to inspect the leased premises for lead-based paint hazards.

With respect to the Capen Street tenancy, the BHA's Section 23 AC contract provides that the "Local Authority," here the BHA, "shall require as a condition for the making of housing assistance payments, that the Owner at all times maintain the Project in decent, safe, and sanitary condition." In addition, the AC contract obligated the BHA to inspect the premises "prior to commencement of occupancy," and thereafter, at least annually "to assure that decent, safe, and sanitary housing accommodations are being provided." Under the Section 23 HAP contract, the BHA agreed to "inspect, or cause to be inspected, at least annually, the Premises to determine that they are in decent, safe, and sanitary condition." Regulations in effect at the time imposed the following obligations on both

property owners and local housing authorities in order for the leased premises to satisfy the "decent, safe, and sanitary" standard. 24 C.F.R. § 802.102 (a) (1977). The obligations as to owners were as follows:

> "The owner shall provide either (i) a certification from the authorized local government official or a qualified laboratory that exposed interior and exterior surfaces are free of lead based paint hazards, or (ii) a certification by the owner that those surfaces have been adequately treated or covered, all in accordance with the applicable HUD regulations issued pursuant to the Lead Based Paint Poisoning Prevention Act, 42 U.S.C. [§] 4801."

*Id.* at § 802.102 (a) (2). Local housing authorities were required to proceed as follows:

> "Before approving a lease, the [local housing authority] shall make appropriate inquiries to ascertain that all certifications required by law have been issued and are currently valid. In addition, the [local housing authority] shall inspect the unit, or cause it to be inspected, for compliance with all other requirements of § 802.102(a). An inspection report shall be maintained by the [local housing authority] for each unit inspected specifying whether required certifications, if any, have been issued and the results of the inspection."

*Id.* at § 802.205 (g) (3) (i).

With respect to the Warner Street tenancy, the BHA's HAP contract states:

> "The [public housing authority] shall inspect or cause to be inspected the Contract Unit and related facilities at least annually and at such other times (including prior to initial occupancy of the unit) as may be necessary to assure that the Owner is meeting his obligation to maintain the unit in Decent, Safe, and Sanitary condition . . . ."

Under regulations promulgated by HUD, the BHA was required to inspect the premises prior to approving the lease to

determine that the premises are "maintained in [d]ecent, [s]afe, and [s]anitary condition," 24 C.F.R. § 882.116 (o) (1979), and was required to inspect the premises at least annually "to assure that the Owner is meeting his obligations to maintain the unit in [d]ecent, [s]afe, and [s]anitary condition," *id*. at § 882.211 (b). The standard for maintaining a "decent, safe, and sanitary condition" included the requirement that the unit comply with HUD regulations relating to lead-based paint issued pursuant to the Lead Based Paint Poisoning Prevention Act, 42 U.S.C. § 4801. 24 C.F.R. §§ 882.102 and 882.109. Those regulations state that "[p]rior to the occupancy of HUD-associated housing, immediate hazards shall be eliminated by the most practicable means. For this purpose, all defective paint conditions shall be assumed to be immediate hazards." *Id*. at § 35.24 (a). The regulation defines "[i]mmediate hazard" to include "paint (which may contain lead) on applicable surfaces which is cracking, scaling, chipping, peeling or loose." *Id*. at § 35.3 (i). The HUD lead-based paint regulations made the local housing authority, the BHA, responsible for conducting visual inspections of the premises to determine whether an immediate hazard existed. *Id*. at § 35.24 (b) (1) (v).

The plaintiff suffered lead-based paint poisoning as a result of inhalation or ingestion of lead-based paint while she lived at both the Capen Street and Warner Street residences. Chipping and flaking lead paint was present in both residences, in violation of both the Section 23 and Section 8 program requirements, while the plaintiff resided in each residence. The BHA did not obtain certification concerning the absence or treatment of lead-based paint hazards as required by the Section 23 regulations, particularly 24 C.F.R. § 802.102 (a) (2).

At various times before her Capen Street tenancy, the plaintiff's mother attended meetings or met with BHA employees responsible for administering the Section 23 program. Some of these meetings were part of the Section 23 application and orientation process. At one orientation meeting (a group meeting), the plaintiff's mother stated that the BHA informed the group that they "were all entitled to safe, afford-

able, and decent housing, and the apartment would be inspected to ensure the quality . . . of the living arrangements."

After the plaintiff's mother had moved into the Capen Street address, she complained to a BHA inspector about some problems with the apartment, including peeling and flaking paint. The inspector assured her that "it would be taken care of."

The first time the plaintiff's mother discussed the issue of lead paint with the BHA was after the plaintiff was found to have elevated blood lead levels. On numerous occasions, she explained her daughter's condition to the BHA and the need to remove the lead-based paint from the premises. BHA inspectors wrote down what the plaintiff's mother had said but did not otherwise respond to her statements. The inspectors never told her what, if anything, they planned to do in response to her complaints.

During her first week at the Warner Street apartment, the plaintiff's mother made numerous telephone calls to the BHA complaining about the condition of the apartment. In complaining to the BHA, she specifically mentioned the existence of chipping, flaking, or peeling paint in the apartment. The plaintiff's mother did not recall whether anyone from the BHA ever made any statements to her regarding lead or lead paint. However, she was assured by a BHA inspector that "the apartment would be made sanitary and clean and according to standards for [her] and [her] family." The BHA inspector assured the plaintiff's mother that "they would take care of it."

The plaintiff brought suit against the BHA and the owners of the Capen Street and Warner Street apartments in June, 1998. The BHA moved for summary judgment arguing that, as a public employer,[3] the exemptions set forth in § 10 (*f*) and (*j*) of the Massachusetts Tort Claims Act, G. L. c. 258, which were enacted in 1994 (the 1994 amendments), rendered it immune

---

[3]There is no dispute that the BHA is a "[p]ublic employer" as defined in G. L. c. 258, § 1. See *Ayala* v. *Boston Hous. Auth.*, 404 Mass. 689, 703 (1989) (stating that "[a] housing authority is a 'public employer' within the meaning of G. L. c. 258, § 1").

from suit on the plaintiff's claims. See St. 1993, c. 495, § 57.[4,5] The BHA also argued that there was no evidence from which a jury could reasonably infer that it made any "explicit and specific assurances of safety or assistance" as contemplated in G. L. c. 258, § 10 (*j*) (1), see note 4, *supra*, the saving provision of the exclusion contained in § 10 (*f*). The judge allowed the BHA's summary judgment motion, rejecting the plaintiff's claims that retroactive application of the 1994 amendments (specifically, G. L. c. 258, § 10 [*f*] and [*j*]), to her contract-based claims violates the contract clause of the Constitution of the United States ("No state shall . . . pass any . . . law impairing the obligation of contracts"), and that genuine issues of material fact existed concerning whether the BHA made "explicit and specific assurances of safety or assistance" as contemplated by § 10 (*j*) (1). This appeal followed.

---

[4]General Laws c. 258, § 10, as appearing in St. 1993, c. 495, § 57, provides in relevant part:

> "The provisions of sections one to eight, inclusive, shall not apply to: — . . .

> "(*f*) any claim based upon the failure to inspect, or an inadequate or negligent inspection, of any property, real or personal, to determine whether the property complies with or violates any law, regulation, ordinance or code, or contains a hazard to health or safety, except as otherwise provided in clause (1) of subparagraph (*j*).

> ". . .

> "(*j*) any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer. This exclusion shall not apply to:

> "(1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance."

[5]The Legislature provided that the 1994 amendments to G. L. c. 258 were to be applied retroactively "to all claims upon which a final judgment has not entered, or as to which an appeal is pending or the appeal period has not expired." St. 1993, c. 495, § 144.

1. The judge erred in concluding that retroactive application of the 1994 amendments to the plaintiff's contract-based claims against the BHA did not violate the contract clause. The governing principles on the contract clause issue are stated in *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977), and *Massachusetts Community College Council v. Commonwealth*, 420 Mass. 126 (1995). The contract clause is "one of the few express limitations on [S]tate power." *United States Trust Co. v. New Jersey, supra* at 14. It "limits the power of the States to modify their own contracts as well as to regulate those between private parties." *Id.* at 17. The contract clause, however, "does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects" (footnote omitted). *Id.*

A contract clause violation exists only if several factors are satisfied. "The first consideration under the Contract Clause is whether subsequent State action has in fact impaired any enforceable contractual obligation." *Massachusetts Community College Council v. Commonwealth, supra* at 131. The next inquiry is "whether the impairment is substantial." *Id.* Even if a substantial impairment exists, the impairment still may be constitutional if "it is reasonable and necessary to serve an important public purpose." *Id.* at 132. The State carries the burden of making this latter showing. *Id.* at 133. In a case like this, a "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co. v. New Jersey, supra* at 26.

The parties agree that the judge correctly relied on the case of *Ayala v. Boston Hous. Auth.*, 404 Mass. 689 (1989), in finding an enforceable contractual obligation under a third-party beneficiary theory, specifically, that the plaintiff was an intended third-party beneficiary under the Section 23 and Section 8 program HAP contracts with respect to the BHA's obligation to inspect the premises.[6,7] In the *Ayala* case, two minor children of

---

[6]The plaintiff also established that she was a third-party beneficiary with respect to the Section 23 program AC contract. See *Ayala v. Boston Hous. Auth., supra* at 700-701.

[7]The plaintiff does not challenge the judge's conclusion that any duty on

a Section 8 tenant (their mother) brought an action seeking damages for lead-based paint poisoning against the BHA, the Section 8 administrator that had entered into an AC contract with HUD and into an HAP contract with the owner of the apartment in which the children had resided. *Id.* at 690, 694. We concluded that the plaintiffs were third-party beneficiaries of the AC contracts and HAP contracts to the extent those contracts dealt with lead-based paint hazards. *Id.* at 699. Because the BHA was a "public employer" within the meaning of G. L. c. 258, § 1, we also concluded that the plaintiffs' claims resulting from the BHA's breach of its contractual obligations under the AC and HAP contracts were subject to the requirements and limitations of G. L. c. 258. *Id.* at 703-704.

The parties also do not dispute that the judge correctly determined that the 1994 amendments, adopted well after the *Ayala* decision, in fact impaired an enforceable obligation on the part of the BHA. This is so because the 1994 amendments, except for the one narrow exception contained in § 10 (*j*) (1), see note 4, *supra*, have the effect of barring the plaintiff's third-party beneficiary contractual claims.

Turning to the second consideration in the applicable legal framework, we reject the BHA's contention that no "substantial impairment" could have occurred because, when the contracts at issue were executed, there was no declared third-party beneficiary contractual rights recognized by judicial decision or otherwise. The fact that no one sought, prior to the *Ayala* decision, to have a court recognize and enforce such rights does not justify a legal conclusion that the rights did not exist.[8] Further, the BHA's contention ignores a relevant consideration, namely, that the 1994 amendments postdate the *Ayala* decision. Certainly, if there had been any ambiguity whether third-party beneficiary rights existed, the *Ayala* decision put the ambiguity

the part of the BHA to ascertain, pursuant to the Section 23 regulations (24 C.F.R. §§ 802.102 [a] and 802.205 [g] [3] [i]), that all lead compliance certifications required by law had been issued and were valid at the inception of the tenancy, could only be enforced by her under a negligence claim and not under a third-party beneficiary theory.

[8] Children injured by inhalation or ingestion of lead-based paint have three years after they reach the age of majority to commence suit against a public employer. G. L. c. 260, § 7. See *Hernandez* v. *Boston*, 394 Mass. 45, 48-49 (1985).

to rest. The BHA's contention is better left for consideration in deciding whether the impairment was reasonable. At that stage, we must assess whether the BHA satisfied its burden of demonstrating that the impairment was both reasonable and necessary to serve an important public purpose.

We agree with the judge that the 1994 amendments substantially impair the plaintiff's third-party beneficiary claims in this case. With the one limited exception in § 10 (*j*) (1), the Legislature insulated public employers from liability resulting from the general failure to conduct health or safety inspections, the inadequate or negligent performance of such inspections, or the failure to take adequate steps to prevent or diminish the harmful consequences resulting from the tortious conduct of a third person (where the original tortious act was not caused by the public employer). G. L. c. 258, § 10 (*f*) and (*j*).

We turn now to whether the judge correctly concluded that the BHA satisfied its burden of demonstrating that the impairment was both reasonable and necessary to serve an important public purpose. While the judge extensively examined various factors in determining the reasonableness of the impairment, such as the extent of the impairment and the importance of the public purpose served, see *United States Trust Co.* v. *New Jersey, supra* at 27, 29, he entirely omitted any discussion of the required element that the impairment be necessary. Protection of the public treasury is generally unacceptable to support impairment of a contract. *Id.* at 26, 29. Repudiation of the *Ayala* decision by the 1994 amendments would also not suffice to make the impairment necessary. See *United States Trust Co.* v. *New Jersey, supra* at 30 (examining whether action taken was essential and whether other means existed to achieve public goal in determining whether impairment is necessary). Lowering the maximum amount of liability under G. L. c. 258, § 2, to an amount less than the statutory cap of $100,000 was one alternative that could have protected public funds. Adding an exclusion in the relevant contracts expressly stating that the BHA could not be held liable to third parties under the contracts, such as had been inserted in the relevant AC and HAP contracts in *Barnes* v. *Metropolitan Hous. Assistance Program*, 425 Mass. 79, 82 & n.3 (1997), would have rendered the *Ayala* decision

irrelevant. The BHA failed to meet its difficult burden of proving the impairment was necessary. The substantial impairment resulting from the retroactive application of the 1994 amendments is not constitutional.

In light of the BHA's and judge's reliance on the *Barnes* decision, we must clarify a few points. The facts in the *Barnes* case are similar to the facts of this case, and the facts in the *Ayala* case. The plaintiffs, a child and her mother, had been tenants in a federally subsidized rental assistance program administered by a State agency, the Metropolitan Housing Assistance Program (METHAP). *Barnes* v. *Metropolitan Hous. Assistance Program, supra* at 80. The plaintiffs alleged that METHAP breached its obligations under its AC and HAP contracts to inspect for and provide safe housing, and that the breach led to the lead poisoning of the child at the leased premises. *Id.* at 80, 82.

What distinguishes the *Barnes* case from this case and the *Ayala* decision is that the applicable AC and HAP contracts in *Barnes* contained "clauses explicitly excluding METHAP's liability to third parties." *Id.* at 82 & n.3. Nevertheless, the Housing Court judge, relying on the *Ayala* decision, concluded that the exclusionary clauses, even in light of the saving provision appearing in G. L. c. 258, § 10 (j) (1), were unenforceable as contrary to public policy. *Id.* at 82-83. The judge refused to give G. L. c. 258, § 10 (f), retroactive effect "because he found that METHAP's contractual duties to the plaintiffs had vested prior to the enactment and the contract clause . . . subjects 'a [S]tate-created impairment of its own obligations . . . to . . . scrutiny,' which it cannot survive." *Id.* at 83.

Based on the existence of the exclusionary clauses in the AC and HAP contracts, we concluded that METHAP owed no contractual duty to the plaintiffs. *Id.* at 84-85. Rather than stating that the *Ayala* decision was grounded in public policy considerations as is suggested by the BHA and the judge, we concluded in the *Barnes* decision that the Housing Court judge in that case improperly relied on *Ayala* to void the exclusionary clauses as against public policy. *Id.* at 85. With respect to the argument made by the plaintiffs in the *Barnes* case that the retroactive application of § 10 (f) to the contracts in that case

would violate the contract clause, we explained that such a violation could not occur because no contractual obligation existed due to the exclusionary clauses. *Id.* at 85-86. The *Barnes* decision did *not* overrule the *Ayala* decision in any respect.

The BHA argues that the judge correctly concluded that no contract clause violation occurred because, as in the *Barnes* decision, there is "not the kind of retroactive varying of a State's contractual obligation to which the contract clause is addressed." *Id.* at 86. The quotation is misconstrued. There was no "retroactive varying" because the AC and HAP contracts in the *Barnes* case contained exclusions that had the same effect as § 10 (*f*). There were no such exclusionary clauses in the contracts in this case so the same conclusion cannot be drawn here. Further, the case of *General Motors Corp.* v. *Romein*, 503 U.S. 181, 186-187 (1992), is distinguishable because no contractual obligation was found in that case, and, consequently, the United States Supreme Court never reached "the questions of impairment."

2. We reject the plaintiff's contention that a genuine issue of material fact exists concerning whether the BHA's various verbal assurances to her mother about the condition of the leased premises were the kind of "explicit and specific assurances of safety or assistance" contemplated under G. L. c. 258, § 10 (*j*) (1).[9] While the plaintiff's mother stated her concerns to BHA representatives regarding peeling and flaking paint in both the Capen Street and Warner Street apartments, that concern was one of several concerns or complaints she had lodged. The various responses by BHA inspectors, including that "it would be taken care of," her apartment would be made "sanitary and clean," she was entitled to "safe, affordable, and decent housing," and "they would take care of it," did not constitute "explicit and specific assurances" that "the premises [were] free of lead paint hazards." *Barnes* v. *Metropolitan Hous. Assistance Program, supra* at 87. The responses contain no definitiveness, are not fixed, and do not state, with any reasonable measure of assurance, that the BHA was actually going to de-lead the premises or otherwise address the lead-based paint

---

[9]The issue is relevant to the plaintiff's negligence claims, which remain subject to the exclusions in G. L. c. 258, § 10 (*f*) and (*j*).

issues in a specified manner. See *Lawrence* v. *Cambridge*, 422 Mass. 406, 410 (1996) (explaining that term "explicit" "mean[s] a spoken or written assurance, not one implied from the conduct of the parties or the situation," and term "specific" means "the terms of the assurance must be definite, fixed, and free from ambiguity"). The plaintiff argues that because the BHA knew of the scope and extent of its own legal duty concerning lead-based paint hazards, the assurances made by the BHA inspectors were in fact specific. Where none of the BHA inspectors ever mentioned lead paint or lead paint hazards in any of their responses, however, the plaintiff's argument in essence is "the sort of assurance 'implied from the conduct of the parties or the situation,' " see *Barnes* v. *Metropolitan Hous. Assistance Program*, *supra*, quoting *Lawrence* v. *Cambridge*, *supra*, and amounted only to "general representations" under § 10 (*j*) (1). Because no genuine issue of material fact exists concerning whether the BHA's responses and assurances were sufficiently specific and explicit to satisfy § 10 (*j*) (1), the judge correctly allowed summary judgment in favor of the BHA on the plaintiff's claims of negligence.

3. The order of the judge allowing summary judgment with respect to the plaintiff's contract claims, Count IV and Count VIII of the amended complaint, is vacated, and we reverse the judgment as to those counts (Count IV and Count VIII of the amended complaint). The order and judgment with respect to Counts III and VII, asserting negligence claims, are affirmed. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*