LISA BUTNER & others[1] *vs.* DEPARTMENT OF STATE POLICE
& others.[2]

No. 02-P-390.

Suffolk. September 17, 2003. - February 18, 2004.

Present: CYPHER, COWIN, & MILLS, JJ.

*Practice, Civil,* Summary judgment. *Massachusetts Civil Rights Act. Massachusetts Commission Against Discrimination. Anti-Discrimination Law,* Sex, Employment. *State Police. Conspiracy. Emotional Distress.*

This court concluded that five female police officers were barred from bringing a claim against a health organization and its medical employee under the Massachusetts Civil Rights Act, G. L. c. 12, where the plaintiffs failed to first name those defendants in complaints to the Massachusetts Commission Against Discrimination (MCAD) [466-467]; likewise, the plaintiffs' claims that the medical defendants conspired with the plaintiffs' employer in discriminating against them on the basis of their pregnancies in violation of G. L. c. 151B, § 4, were barred, because the plaintiffs failed to pursue the exclusive first remedy for such violation with the MCAD [467-468].

A Superior Court judge properly granted summary judgment in favor of a health organization and a doctor on a federal civil conspiracy claim brought by five female State troopers under 42 U.S.C. § 1985(3), where the plaintiffs did not set forth facts to support a finding that the medical defendants, in performing contractual duties, including examining troopers and determining their ability to work, shared the plaintiffs' employer's goal of violating the civil rights of pregnant state troopers by placing them on temporary modified duty or no duty status [468-470], and where summary judgment was not an inappropriate method by which to dispose of a question of discriminatory purpose [470].

The behavior of a doctor and his employing health organization in purporting to give medical opinions as to five pregnant State troopers' ability to work, while a troubling unprofessional charade, did not so exceed the bounds of decency as to be deemed extreme and outrageous for purposes of a claim of intentional infliction of emotional distress. [470-472]

CIVIL ACTION commenced in the Superior Court Department on April 8, 1998.

[1]Sarah O'Leary, Caryl Sprague, Susan Howe, and Brenda Watts.
[2]Health Resources and Dr. Thomas H. Winters.

The case was heard by *Judith Fabricant,* J., on motions for summary judgment, and entry of separate and final judgment was ordered by *Vieri Volterra,* J.

*Brian J. Rogal* for the plaintiffs.

*Paul D. Wilson* for the defendants.

MILLS, J. The plaintiffs, female State police officers (troopers), brought a complaint alleging that their employer, the Department of State Police (department), had discriminated against them on the basis of gender in violation of G. L. c. 151B, § 4; that the defendant Health Resources (HR) and its employee Dr. Thomas H. Winters (collectively, the medical defendants) conspired with the department to discriminate against the plaintiffs based upon their gender in violation of 42 U.S.C. § 1985(3), and the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I (MCRA); and that Winters's actions with respect to the plaintiffs constituted intentional or reckless infliction of emotional distress. At all relevant times the defendant HR was acting under contract with the defendant department. The defendant Winters was an employee of HR, a medical doctor, and designated as the "State Police Surgeon." A Superior Court judge granted summary judgment as to the defendants HR and Winters, and the plaintiffs appealed. We affirm.

1. *Background.*[3] In 1997, each of the troopers was assigned to a different position, but each worked in plain clothes, driving an unmarked police cruiser. They were not required to perform patrol duties, make traffic stops, or respond to routine calls. Some troopers worked evening shifts, and some regularly worked overtime.

Each of the troopers was pregnant during some part of 1997. Four of them had had earlier pregnancies during which they had continued working without the imposition of any restrictions by the department. During their prior pregnancies, Troopers Watts, Butner, and Howe had worked until they delivered.

During 1997, and for several years prior, the department contracted with HR to provide medical examinations for troopers, including reenlistment examinations and determinations of

---

[3]We take these facts from the summary judgment record, resolving differences and drawing inferences in favor of the plaintiffs.

ability to work. Part of Winters's duties, as an employee of HR and as the State police surgeon, included formulation of medical policy for the department.

In 1997, the department adopted a practice of sending a female trooper to HR upon learning of her pregnancy. At the same time, the department was developing a "temporary modified duty" (TMD) policy, and the first three drafts of the policy singled out pregnancy as a basis for a female trooper's placement on TMD. Troopers on TMD lost use of their cruisers,[4] were not allowed to wear uniforms or have contact with prisoners or with the public in an enforcement capacity "unless in an emergency situation," and were not permitted any overtime pay.[5]

At the time the department began requiring pregnant troopers to report to HR, the department also sent HR a document entitled "Essential Function Task List" (task list), which the HR doctors were to use in evaluating pregnant troopers.[6] One of the early iterations of the task list, dated May, 1995, which was the one used by HR with respect to the plaintiffs, contained such tasks as roping a steer and lifting a 600-800 pound motorcycle from its side to an upright position. Even though most Massachusetts troopers were never called upon to do most of the items on the task list, the department instructed HR that its doctors should only recommend "full duty" for troopers who could safely perform every single task on the list; otherwise the doctors were to recommend either TMD or "no duty." Only a small percentage of the listed tasks had any relationship to the jobs the plaintiffs were doing. For example, out of 131 tasks on the list, Watts performed only thirty-two as part of her job. During her entire career, Trooper Butner had performed only thirteen. The task list had not been used by HR or the department prior to the time they began using it to evaluate pregnant

---

[4]All Massachusetts troopers are assigned cruisers, which they use for travel to and from their homes and duty assignments, as well as in the course of their duties.

[5]All of these consequences were apparent to Winters and other HR doctors from the face of the medical report forms they executed for each trooper.

[6]The record contains at least three versions of the task list: one dated May, 1995, with 131 items; one dated June, 1995, with 194 items; and one dated September, 1995, with 129 items.

troopers. It is reasonable to infer that HR knew that the task list had not been used other than for that purpose.

Although they had no role in developing the task list, Winters and the other HR doctors used the list to justify recommending TMD status for each of the plaintiffs. When the plaintiffs were required to report for medical examinations, generally no actual examination was performed other than discussion of the pregnancy.[7] HR and Winters were told by the department to see pregnant troopers until they were placed on TMD. HR and Winters knew that the department wanted all pregnant troopers placed on TMD and felt pressured to recommend TMD. Even when HR doctors believed that the pregnant troopers whom they evaluated could safely carry out their assignments, they nonetheless recommended TMD. When HR doctors were willing to keep a pregnant trooper on full duty, they were not allowed to do so.[8]

The doctors at HR had no expertise in obstetrics and conducted no examination of pregnant troopers before executing the paperwork that was part of the protocol resulting in the TMD status. Aside from contacting some of the plaintiffs' personal obstetricians,[9] none of the HR doctors consulted with any expert or treatise in determining the abilities of pregnant troopers. Instead, HR doctors based their determinations on Winters's belief that at some point during every woman's pregnancy she would be unable to perform at least one of the items on the list. Thus, as far as HR and Winters were concerned, a simple interview provided sufficient information to make a TMD recommendation for a pregnant trooper.

---

[7]O'Leary reported for her biennial reenlistment examination without informing the doctor that she was seven months pregnant. Upon discovering during the examination that she was pregnant, the doctor ended the physical examination.

[8]One HR doctor signed a form indicating that Trooper Sprague could remain on full duty and perform her regular duties, only to have the decision overridden by Winters at the direction of the department. That doctor later stated that she was "yelled at" when she tried to retain a pregnant trooper on full duty. Another HR doctor implied to Trooper Howe that she could remain on full duty, but thereafter left the room, rewrote the evaluation form, and put the trooper on TMD.

[9]When Winters contacted Butner's physician, however, he did not use her opinion in making his TMD recommendation, and he even mischaracterized her opinion as if it had contributed to his own.

In practice, a pregnant trooper would report to a doctor at HR where the trooper would complete the top half of a one-page document entitled "State Police Surgeon's Medical Report Form," which was printed on HR letterhead and was apparently designed to be used in the medical evaluation of injured employees. In the space marked "nature of injury," the trooper was expected to identify herself as pregnant, and the doctor would complete the bottom half of the form, which included a "recommendation" and response to the phrase, "patient is able to perform:" by checking off "full duty," "temporary modified duty," or "no duty." By recommending TMD, the HR doctor purportedly gave the department authority to "return the officer to administrative light duty with [a] provision . . . preclud[ing] operating a cruiser, wearing a uniform, working overtime or details, having contact with the public in an enforcement capacity, and having contact with prisoners." Although the parties contest HR's precise role in determining the troopers' duty status, from all that appears in the pleadings and exhibits, the contractual relationship between the department and HR and the instructions from the department to HR provided no "authority" to the HR personnel to change medical standards pertaining to duty status, and the HR physicians performed no authentic evaluation, acting simply as scriveners in checking off a block on a prescribed form, although printed on HR letterhead. Nonetheless, for summary judgment purposes, we assume arguendo that the plaintiffs could establish that HR and Winters had sufficient authority to place them on TMD just by signing the medical report forms.

By March of 1997, placement on TMD appears to have been virtually automatic for pregnant troopers, including the plaintiffs. As a direct result of HR's and Winters's recommendations, all of the plaintiffs were placed on TMD because of their pregnancies.[10] All of the troopers initially objected to this placement, wanting to keep their cruisers and to continue working their normal shifts and hours, appearing in public as required by their assignments. The plaintiffs were threatened with being

---

[10]Trooper Butner was fourteen weeks pregnant when so placed; Trooper Sprague, four months; Trooper Howe, seven and one-half months; Trooper O'Leary, seven months; and Trooper Watts, seven months.

placed on unpaid leave if they refused TMD, a purportedly voluntary status, and therefore most acquiesced to placement on TMD. Trooper Butner was placed on "no duty" status when she objected to TMD. As a result of the threat of unpaid leave, reinforced by knowledge of Trooper Butner's experience, some of the plaintiffs attempted to hide their pregnancies from the department. Despite their TMD status, the plaintiffs continued working their respective assignments, but with the restrictions and without the privileges mentioned above.

In October, 1997, the Executive Office of Public Safety forced the department to change its policy regarding pregnancy. Thereafter, pregnant troopers were no longer sent to HR, and the plaintiffs were allowed to return to full duty with only a clearance note from their individual physicians. Troopers Sprague, O'Leary, and Butner, who were still pregnant, returned to full duty.

2. *Standard of review.* In reviewing the grant of summary judgment, we decide whether, "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991). We resolve any inferences in favor of the nonmoving party, and in our review, "[w]e may consider any ground supporting the judgment." *Ibid.* We need not necessarily adopt the lower court's reasoning to affirm.

3. *Massachusetts Civil Rights Act.* The judge allowed the medical defendants' motion for summary judgment after determining that the alleged conduct, which involved no physical confrontation, did not rise to the level of "threats, intimidation or coercion" required under the MCRA. See G. L. c. 12, § 11H, as inserted by St. 1979, c. 801, § 1. However, the judge did not decide the threshold question whether the plaintiffs' MCRA claim as to HR and Winters is barred due to the plaintiffs' failure to first name the medical defendants in complaints to the Massachusetts Commission Against Discrimination (MCAD).[11]

It is evident that the actions the plaintiffs alleged under the

---

[11]Notwithstanding the absence of most of the MCAD complaint forms from the appellate record, the forms that are in the summary judgment record show

MCRA would also give rise to a claim under G. L. c. 151B, § 4. Because G. L. c. 151B, § 9, establishes an exclusive administrative procedure for addressing violations of G. L. c. 151B, § 4, with which the plaintiffs have failed to comply, their MCRA claims against the medical defendants must fail. See *Green* v. *Wyman-Gordon Co.*, 422 Mass. 551, 555 (1996); *Mouradian* v. *General Elec. Co.*, 23 Mass. App. Ct. 538, 543 (1987).

Section 4(1) of G. L. c. 151B prohibits employers from discriminating on the basis of sex in the absence of a bona fide occupational qualification. Discrimination on the basis of pregnancy amounts to sex discrimination actionable under that section. *Massachusetts Elec. Co.* v. *Massachusetts Commn. Against Discrimination,* 375 Mass. 160, 169 (1978). Chapter 151B, § 4 (4A) and (5), as amended by St. 1989, c. 722, § 14, prohibits any person from interfering with another's exercise of rights granted or protected under c. 151B, and proscribes aiding, abetting, inciting, compelling or coercing (or attempting to aid, abet, incite, compel or coerce) "the doing of any of the acts forbidden under this chapter." As the plaintiffs allege that the medical defendants conspired with the department in discriminating against the officers on the basis of their pregnancies, it is apparent that their allegations give rise to a c. 151B claim.

Under G. L. c. 151B, § 9, the exclusive first remedy for a c. 151B violation is a complaint to the MCAD, i.e., a complainant may not bring a civil action against defendants such as HR and Winters without first complaining to the MCAD.[12] Complaints constituting c. 151B claims cannot be refashioned into

only that some plaintiffs brought MCAD complaints against the department. See, e.g., plaintiff Watts's MCAD charge of discrimination, naming only the department. We therefore decide the officers' MCRA claim assuming that they did not file MCAD complaints naming HR or Winters as respondents. Despite the defendants having argued this issue both at summary judgment and on appeal, the plaintiffs have not answered the defendants' charge either with any evidence that they did in fact name the medical defendants in an MCAD complaint or with any argument whatsoever for overcoming the exclusive remedy provision discussed *infra*.

[12]Section 9 of G. L. c. 151B, as amended by St. 1991, c. 323, § 2, states in relevant part:

"The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any

MCRA claims to avoid the exclusivity provision. *Green* v. *Wyman-Gordon Co.*, 422 Mass. at 555. *Mouradian* v. *General Elec. Co.*, 23 Mass. App. Ct. at 543. See *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 582-586 (1994); *Cherella* v. *Phoenix Technologies Ltd.*, 32 Mass. App. Ct. 919, 919 (1992). Consequently, the plaintiffs here cannot maintain a claim under MCRA, because they failed first to pursue the MCAD remedy.[13]

Further, even if the plaintiffs timely filed MCAD complaints against the department (a subject about which we express no opinion), they cannot maintain a civil action against any defendant not named in the MCAD complaint. See note 11, *supra*; *Powers* v. *H.B. Smith Co.*, 42 Mass. App. Ct. 657, 667 (1997). This is particularly true where, as here, the plaintiffs were aware of the medical defendants' involvement in the alleged discrimination at the time the MCAD complaint was filed. *Ibid.*[14]

4. *Federal civil conspiracy claim.* Under 42 U.S.C. § 1985(3), the plaintiffs must show that the defendants (1) conspired (2) for the purpose of depriving, either directly or indirectly, any

---

provision hereof shall not apply . . . ; but, as to acts declared unlawful by section four, the procedure provided in this chapter shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned.

"Any person claiming to be aggrieved by a practice made unlawful under this chapter . . . may, at the expiration of ninety days *after* the filing of a complaint with the commission, or sooner if a commissioner assents in writing, but not later than three years after the alleged unlawful practice occurred, bring a civil action for damages or injunctive relief or both in the superior or probate court" (emphasis added).

[13]Because the plaintiffs' MCRA claims against the medical defendants are barred, we do not reach the substantive question whether the defendants' conduct amounted to "threats, intimidation or coercion."

[14]The purpose of the requirement is to provide the party with notice of a potential lawsuit and an opportunity to conciliate. Although the plaintiffs have offered neither argument nor evidence on this issue, there may be an exception where a plaintiff filed an MCAD complaint against another party and the unnamed party had notice and opportunity to participate in the proceedings. See *King* v. *First*, 46 Mass. App. Ct. 372, 374-375 (1999), citing Federal cases. It is nevertheless incumbent upon the plaintiff in a case that would give rise to a G. L. c. 151B claim to allege and prove its compliance with the exclusive remedy provision, or in the alternative, to claim and set forth facts to justify an exception to the rule. Even if Massachusetts law were to follow the Federal precedents, see *ibid.*, we are unable to consider any such exception for these plaintiffs, who have alleged no such facts.

person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws (3) causing to be done an act in furtherance of the object of the conspiracy (4) resulting either in injury to another person or his or her property or in depriving him or her of having or exercising any right or privilege of a United States citizen. *Aulson* v. *Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996). *LaManque* v. *Massachusetts Dept. of Employment & Training*, 3 F. Supp. 2d 83, 90-91 (D. Mass. 1998). To satisfy the second element, plaintiffs must establish, inter alia, both that " 'invidiously discriminatory *animus* [lay] behind the conspirators' action,' . . . and . . . that the conspiracy *'aimed at* interfering with rights' that are 'protected against private . . . encroachment' " (emphasis added) (citations omitted). *Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993). In *Bray*, the Supreme Court made clear that plaintiffs face a heavy burden in that

> "it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be *'aimed at'* . . . ; its impairment must be a conscious objective of the enterprise. Just as the 'invidiously discriminatory animus' requirement . . . requires that the defendant [has] taken his action 'at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group,' . . . so also the 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." (Citations omitted.)

506 U.S. at 275-276. The judge found that the plaintiffs did not set forth facts to support a finding that HR or Winters shared a purpose to further a discriminatory policy. We agree.

We assume, arguendo, that the department was motivated by discriminatory animus in enforcing the TMD policy against pregnant troopers. Even so, at most the plaintiffs have established facts from which a jury could infer that Winters and HR knew and understood that the department held such animus,

and that they even played a critical role in the discriminatory scheme. The plaintiffs have not shown, however, any facts from which a jury could otherwise infer the defendants' own animus toward women in general or pregnant women in particular. They have shown no evidence that the medical defendants performed their obligations under the contract for any motive other than an economic one, i.e., to keep their contract with the State agency. Under *Bray*, it is too great a leap for a jury to infer that, merely because the defendants participated as essential players in the discrimination, they therefore must have shared the department's specific goal of violating the civil rights of pregnant State troopers. Even if the department could not have accomplished its discriminatory plan without the help of the medical defendants, the rule in *Bray* requires that we must nonetheless affirm summary judgment in the absence of any evidence that the medical defendants' predominant purpose was to discriminate against the plaintiffs.

The plaintiffs contend that summary judgment is inappropriate on the question of discriminatory purpose, but Federal courts have granted and upheld summary judgment on this very issue where plaintiffs have failed to set forth evidence, either direct or circumstantial, of animus. See *Burns* v. *State Police Assn. of Mass.*, 230 F.3d 8, 12-14 (1st Cir. 2000); *Powell* v. *Pittsfield*, 143 F. Supp. 2d 94, 130 (D. Mass. 2001). Compare *Rosado* v. *Sabat*, 204 F. Supp. 2d 252, 266 (D.P.R. 2002). Today, we follow their lead and do the same.

5. *Intentional infliction of emotional distress.* To make out a claim for intentional infliction of emotional distress, the plaintiffs must show that (1) the defendants intended to inflict emotional distress or knew it to be the likely result of their actions, (2) the conduct was "extreme and outrageous, . . . beyond all possible bounds of decency and . . . utterly intolerable," (3) the defendants' conduct caused the emotional distress, and (4) the distress was "severe[, such] that no reasonable [person] could be expected to endure it" (citations omitted). *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). Without considering the other elements, the judge granted summary judgment for the medical defendants, finding that their conduct was not extreme and outrageous. We reluctantly affirm

and likewise need not consider the other elements of intent, severity, or causation.

In reviewing the plaintiffs' claim, we examine the record for any evidence or reasonable inference of extreme and outrageous conduct by the defendants. A reasonable fact finder could determine that Winters and other HR physicians, knowing of the department's arguably discriminatory purpose, interviewed the plaintiffs about their pregnancies and refused to conduct physical examinations on them. Winters and the other physicians insisted on "recommending" TMD status, despite the officers' insistence that they were capable of full duty and despite the officers' personal obstetricians' endorsing their ability to fully perform their present job responsibilities. In Trooper Butner's case, her physician even opined that she could complete all the tasks on the list.[15] Winters refused to explain his TMD recommendation to Trooper Butner, and he recommended a status of no duty when she declined TMD status. After another HR physician recommended full duty for Trooper Sprague, Winters overrode the recommendation that same day and insisted on TMD instead.

While we are deeply troubled by the unprofessional charade of HR and Winters purporting to give medical opinions as to the officers' ability to work, we agree with the judge's conclusion that the medical defendants' behavior did not so exceed the bounds of decency as to be deemed extreme and outrageous. The medical defendants' actions here are distinguishable from the examples of extreme and outrageous conduct recognized in prior cases. See, e.g., *Simon* v. *Solomon*, 385 Mass. 91, 97 (1982) (finding that landlord's "pattern of indifference" leading to repeated flooding with sewage of tenant's apartment could be deemed extreme and outrageous); *Bowman* v. *Heller*, 420 Mass. 517, 522 n.6, cert. denied, 516 U.S. 1032 (1995) (upholding finding that superimposing plaintiff's face on pornographic images and distributing them throughout office was extreme and outrageous). There can only be an issue for the jury "if reasonable people could differ on whether the conduct is 'extreme and outrageous.' " *Boyle* v. *Wenk*, 378 Mass. 592, 597 (1979),

---

[15]The record is not clear as to which edition of the list her physician considered.

quoting from *Agis* v. *Howard Johnson Co.*, 371 Mass. at 145-146. See *Kurker* v. *Hill*, 44 Mass. App. Ct. 184, 193-194 (1998); *Brown* v. *Nutter, McClennen & Fish*, 45 Mass. App. Ct. 212, 219 (1998); *Vittands* v. *Sudduth*, 49 Mass. App. Ct. 401, 411 (2000). Here, if a trier of fact "put as harsh a face on [the defendants'] actions . . . as the basic facts would reasonably allow," their conduct might be deemed cowardly for not challenging the department's policy and even perceived as a sham medical examination, but it could not be deemed extreme and outrageous. See *Richey* v. *American Auto. Assn.*, 380 Mass. 835, 839 (1980); *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1997). Accordingly, the plaintiffs have failed to sustain their claim for intentional infliction of emotional distress.[16]

*Judgment affirmed.*

---

[16]For the same reason, the claim in the alternative for reckless infliction of emotional distress also fails.