Billings, Thomas P., J.
For the reasons that follow, the defendants’ Motion for Summary Judgment is ALLOWED.
PROCEDURAL BACKGROUND
On September 10, 2002, the plaintiff (“Chaffee"), a correctional officer, brought this action in Superior Court following proceedings at the Massachusetts Commission Against Discrimination (“MCAD”) in which she alleged sexual harassment and gender discrimination against her employer.
Specifically, Chaffee alleged that the DOC failed to investigate complaints of sexual harassment and gender discrimination by her coworkers, Jones and Wald-ron, and to take remedial steps to stop such harassment.
On January 7, 2000, Chaffee filed a Charge of Discrimination against the DOC for gender discrimination and sexual harassment, adverse employment action, and constructive discharge. Her case remained in MCAD for 22 months without a probable cause determination. On October 31, 2001, Chaffee moved to dismiss the MCAD complaint in order to file this action in Superior Court. Two days later, on November 2, 2001, MCAD granted plaintiffs request.
Approximately 10 months later, on September 10, 2002, Chaffee filed in Superior Court. On December 20, 2002, she amended her complaint. The three counts of the Amended Complaint allege the following:
Count I: That the DOC violated G.L.c. 151B, by failing to investigate Chaffee’s complaints of coworkers’ sexual harassment and gender discrimination or take remedial steps to terminate the harassment;
Count II: That the DOC subjected her to adverse employment action, namely, a lengthy investigation based on false allegations of misconduct with inmates, and a demotion to a tower duty position after she made complaints of coworkers’ sexual harassment and gender discrimination to her supervisors; and
Count III: That the DOC constructively discharged her by creating an unbearably difficult work environment that caused her to take two leaves of absence.[2]
FACTUAL BACKGROUND
The following facts are taken from the summary judgment record and are viewed in the light most favorable to Chaffee.
The DOC is the state agency responsible for the care and custody of adults sentenced to the state correctional system. Chaffee began working for the DOC in February 1998 as a correctional officer at North Central Correctional Institute (“NCCI”) in Gardner. At that time, she was one of 12 female correctional officers working at the facility, which employed approximately 360 correctional officers in all.
I. Events Before September 10, 1999
In November 1998, Chaffee was assigned to work in NCCI’s B Unit at a two-person post with alternating partners, Jones and Waldron. Together, the three were responsible for guarding 64 inmates in a large common room. Soon after Chaffee began in the assignment, Jones and Waldron began making harassing statements to her, specifically, that a correctional facility was not a “woman’s place” and that women should not work there. Chaffee reported these statements to her supervisor, Sergeant Diane LeBlanc (“Sgt. LeBlanc”), but no investigation or disciplinary action was ever taken. After this incident, Chaffee consistently reported other problems with her partners, including another incident whereby Jones allegedly spoke to her in a disrespectful manner in front of inmates by saying the “next time I fucking call you, you come now.”
In July 1999, Chaffee received a telephone call at home from another correctional officer, Brian Rice. Rice, whom Chaffee believed was obsessed with her, informed her that he wanted to see her. Chaffee found Rice in her kitchen shortly after this phone call. He had entered her home without permission and then attempted to kiss her. Although this incident occurred in July 1999, Chaffee did not report it to her supervisors until May 2001.
Sometime in May 1999, the Inner Perimeter Security (“IPS”) at the DOC received a substantial number of anonymous letters accusing Chaffee of bringing contraband into the facility and having inappropriate contact with inmates.[3] Based on these allegations the Superintendent of NCCI, Lynne Bissonnette, authorized an IPS internal investigation of Chaffee on May 29, 1999. On or about August 11, 1999, during the course of this investigation, Bissonnette temporarily reassigned Chaffee to Tower Duty, a non-inmate contact post. After August 11, 1999, Chaffee did not work or have any direct contact with Jones or Waldron ever again, and there were no further reported instances of harassment involving them.[4]
B. Events On and After September 10, 1999
The IPS investigation of Chaffee concluded on September 15, 1999. The findings were detailed in a 14-page report authored by Mark McCaw, a DOC investigator assigned to NCCI. In the report, IPS investigators concluded that Chaffee had violated DOC rules. Specifically, the investigators found that Chaffee had established an inappropriate e-mail relationship with an inmate’s wife and that she failed to report that inmate’s wife’s request that Chaffee bring contraband (hair gel) into the facility for her husband.
Chaffee learned of the investigation and the allegations shortly after she was transferred to tower duty, and became extremely upset by the allegations and by rumors concerning her which began to come to her attention. On September 24, 1999 she had a conver *152 sation with Officer Hammond of the IPS concerning the investigation; he stated that in his view, many of the allegations were true and that the administration was seeking a sanction falling somewhere between a ten-day suspension and termination. This caused Chaffee further upset. Throughout this period, she was receiving medical attention for anxiety and stress. She memorialized these facts in an incident report dated October 12, 1999.
Chaffee’s disciplinary hearing was held on December 2, 1999. On December 13, 1999 DOC Commissioner Michael Maloney issued Chaffee a 20-day suspension without pay based on the following findings:
Chaffee admitted to having exchanged e-mails with an inmate’s wife, but did not report it.
The same inmate’s wife alleged that Chaffee had brought hair care products into the institution for her husband. Chaffee denied this, but admitted she had been asked and that she had not reported the request; nor had she reported an inmate’s request that she bring him cigarettes.
Chaffee testified that several inmates had crushes on her, but that she had not reported this.
Chaffee filed a grievance concerning her 20-day suspension, but later settled by accepting a 15-day suspension.[5] She admitted in her deposition that some discipline was warranted, but had no opinion as to whether the fifteen days was fair or unfair. In January 2000, she served her entire suspension.
From December 1999 until December 2002 occurred a series of incidents which Chaffee asserts constituted harassment and discrimination by the DOC and its employees. Specifically, Chaffee reported that:
On December 22, 1999, her husband received an anonymous letter with a copy of the DOC’s policy concerning employee sexual misconduct with inmates. She considered the letter threatening, harassing, and slanderous.
In January of 2000, that her husband received an anonymous call at work by someone who said, “watch Georgette.”
On March 31,2000, she attended a training session in the training room of NCCI’s C Building. On one of the tables in the room, she found a folder containing confidential information about the IPS investigation into her alleged misconduct. Chaffee believes this report was left out deliberately to humiliate her. She was upset about the incident.
During the summer of 2000, she reported received anonymous prank telephone calls at work to her supervisors. She alleged that the caller said she should “transfer” and sometimes called her a “bitch.” The DOC began an investigation and placed a wiretap on Chaffee’s phone. Investigators discovered that the calls came from within the building but could not conclusively determine who had made the calls given the central location of the phone.
In November 2000, a fellow correctional officer told her that Brian Rice had pulled him aside and told him to stay away from her.
On May 22, 2001, Chaffee filed an incident report because she learned from a coworker that Brian Rice had purchased a handgun and she was concerned for her safety.
In November 2001, an inmate, Andrew Sullivan, (“Sullivan”) approached her and informed her of an ongoing investigation led by IPS officer Mark McCaw (“McCaw”). Chaffee claimed that Sullivan told her that McCaw promised to transfer him to a minimum level security prison if he made false allegations about her.
On December 7, 2002, an e-mail was posted on the Gardner Hill Times Website which Chaffee believe was written by a DOC employee about her. The e-mail reads as follows:
YOU BETTER WATCHER [sic] OUT FOR THE BLACK WIDOW LEATHER FACE CUNT ON THE 7-3 SHIFT SHE HAS SPUN HER NASTY WEB AND CAUGHT 3 OF OUR BROTHER CO’S IN HER WEB. ... IT IS BEYOND MY BELIEF THAT ANY SCREW TALKS TO HER AT ALL . . . BUT I FORGOT THIS IS NCCI AND IT SEEMS THEIR [sic] IS A LOT OF HOT AIR AT THIS JOINT. I HAVE BEEN AT THIS PLACE A LONG TIME EVERY ONE SUPPORTS THE UNION BULLSHIT!!! YOU HAVE A BUNCH OF OLD TIMERS WHO CANT [sic] SHUT THEIR MOUTHS AND INFECT EVERY ONE ELSE IN THEIR ANCIENT WAY OF THINKING. . . . BRING ON THE NEW AND THROW THOSE FAT ASSES TO THE WAYSIDE THE BODY MUST REMAIN STRONG [sic] .UNITE.SLEEPY!!!!!!!!!!!!!!!!!!!!!!
Between August 24, 2000 and October 2, 2000, Chaffee took another stress-induced leave of absence. Since then, she has continued to work as a correctional officer at NCCI.
C. Chaffee’s Charge of Discrimination
As noted above, Chaffee filed her Charge of Discrimination in the MCAD on January 7, 2000. The Charge was signed by counsel. A full summary is unnecessary here; for present purposes, it suffices to note the following:
The Charge alleges that Jones and Waldron harassed Chaffee; that she was “ostracized” after Jones falsely alleged improper relations with an inmate; that other unattributed allegations led to an investigation, with which Chaffee cooperated; that the IPS investigator (Hammond) improperly discussed the investigation with other correctional officers, and told Chaffee on September 24, 1999 that he thought she was guilty of the charges against her; *153 that she was “demoted” in being assigned to tower duty on August 11, 1999; and that a disciplinary hearing was held in December 1999, but no report had yet issued.
The individuals mentioned by name in the Charge are Jones, Waldron, plaintiffs supervisor Sgt. LeB-lanc, Captain Gagnon, and IPS investigator Hammond, Defendant Rice is not mentioned in the Charge; nor is there any mention of any conduct attributable to him.
In April 2001, Chaffee moved for, and the MCAD granted, leave to amend the Charge to assert claims for continuing violations. Chaffee alleged that:
On December 23, 1999 Chaffee’s husband received, by mail from an anonymous sender, a copy of the DOC’s policy concerning sexual misconduct with inmates.
On or before March 22, 2000 (when she submitted an incident report concerning it), a copy of the investigation report concerning her was left unattended on a table in a training session.
Beginning in the summer of 2000, Chaffee received a series of prank and hang-up telephone calls. The DOC never identified or disciplined the caller.
On or before July 4, 2000 Chaffee received a “bizarre” phone call from fellow Correctional Officer Maria Charrette, who told her that because she is attractive she gets a lot of attention from inmates.
In or about November 2000, a George Kapalatis reported to Chaffee that Brian Rice had pulled him aside one day and told him, “stay away from that fuckin’ bitch, she’s trying to hang me.”
Chaffee, between the summer and winter of 2000, had been assigned with another officer to what is normally a one-officer post.
On December 4, 2000 the DOC refused to reinstate 71 days of seniority that Chaffee had lost due to her taking IA (Internal Affairs) leave, even though her LA appeal was successful. This has adversely affected Chaffee’s ability to bid on jobs and shifts.
DISCUSSION
A.Summary Judgment Standard
Summary judgment is granted where there are no issues of material fact and when the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving parly bears the burden of demonstrating affirmatively the absence of a triable issue, and that the moving party is entitled to a judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment, not bearing the burden of proof at trial, may demonstrate the absence of a triable issue by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). A moving party can meet its burden by showing the non-moving party lacks evidence to support the non-moving parly’s case. See Kourouvacilis, 410 Mass. at 711. Once the moving party meets that burden, the non-moving party must show by admissible evidence that there does exist a dispute as to material facts. Id. A non-moving party plaintiff must set forth specific facts showing the existence of an issue for trial. Id.
Summary judgment is appropriate in employment discrimination cases where the party resisting judgment rests merely upon conclusoxy allegations, improbable inferences, and unsupported speculation. See Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34, 38 (2005) (granting summary judgment to employer in claim of age and sex discrimination because employee could not raise pretext by criticizing soundness of employer’s decision-making process, or by arguing employer’s assessment of her job performance); Matthews v. Ocean Spray Cranberries, 426 Mass. 122, 127 (1997) (summary judgment appropriate in employment discrimination cases where defendant’s motion demonstrates that plaintiff is “unable to offer admissible evidence of the defendant’s discriminatory intent, motive or state of mind sufficient to carry the plaintiffs burdens and support a judgment in plaintiffs favor”). Also, such matters as a complainant’s failure to present her claim to the MCAD (e.g., Green v. Wyman-Gordon Co., 422 Mass. 551 (1996), or failure to file within the applicable statutes of limitation (e.g., Cherella v. Phoenix Technologies Ltd., 32 Mass.App.Ct. 919 (1992)), may appropriate for summary disposition where the material facts are not subject to genuine dispute.
B.Employer Liability for Sexual Harassment
In Massachusetts, an employer is vicariously liable for the conduct of supervisors who create a sexually harassing environment in the workplace. College Town v. MCAD, 400 Mass. 156, 162 (1987). Also, an employer who is put on notice of sexual harassment in the workplace, either caused by supervisors, coworkers or customers, and who fails to take adequate steps to remedy the situation, may be liable for sexual harassment pursuant to G.L.c. 151B. Id. at 163. However, an employer may defeat liability under G.L.c. 15 IB by showing it took immediate and appropriate corrective action in response to a non-management employee’s harassing conduct.
C.Statutes of Limitation
An action cannot be brought in the Superior Court under G.L.c. 15 IB, §9 unless it is preceded by the timely filing of a Charge of Discrimination with the MCAD.[6] G.L.c. 151B, §5. The Superior Court action may be commenced ninety days after the filing of complaint with the MCAD, but not later than three *154 years after the alleged unlawful discrimination. G.L.c. 151B,§9.
D. Continuing Violation
The continuing violation doctrine provides an exception to these statutes of limitation whereby a plaintiff may recover for conduct occurring outside the limitations period(s) if she demonstrates a pattern of harassment that includes conduct both within and outside the period (s).
This exception recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact. “Although the limitátions clock generally starts with the commission of a discriminatory act, a true ‘continuing violation’ rewinds the clock for each discriminatory episode along the way.”
Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531 (2001) (citation omitted).
To invoke the continuing violations exception, plaintiff must show that “(1) at least one discriminatory act occurred within the six month limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts [and] (3) earlier violations outside the six-month limitations period did not trigger [the plaintiffs] ‘awareness and duty’ to assert [her] rights.” Ocean Spray Cranberries, Inc. v. Massachusetts Comm’n Against Discrimination, 441 Mass. 632, 642 (2004), citing 804 CMR 1.03(2).
A plaintiffs “awareness and duly” is triggered when she “knew or could have formed a reasonable belief that the earlier violations were discriminatory.” Id. at 644, n. 16. As applied to a claim of sexual harassment, the rule is as follows:
[A] plaintiff who demonstrates a pattern of sexual harassment that creates a hostile work environment and that includes conduct within the six-month statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period, unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct.
Cuddyer, 434 Mass. at 539.
Cuddyer and Ocean Spray both applied the continuing violation doctrine to the requirement, in c. 151B, §5, that a complainant file her Charge of Discrimination within six months (now, 300 days) after the alleged act of discrimination. The Appeals Court has applied the doctrine also to section 9’s three-year statute of limitations for filing an action in the Superior Court, noting that “[i]t would be anomalous to recognize the applicabiliiy of the continuing violation rule in respect to §5 while precluding its application to §9.” Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 222 (1997); followed in Clifton v. Massachusetts Bay Transp. Auth., 62 Mass.App.Ct. 164, 170 (2004), aff'd in part and rev’d in part on other grounds, 445 Mass. 611 (2005). I therefore apply the continuing violation doctrine to the DOC’s limitations defense asserted in this case.
Because it depends on what the plaintiff knew or should have known and when, the application of the continuing violation doctrine to a particular case frequently presents an issue of fact to be decided by the juiy. Clifton, 62 Mass.App.Ct. at 172. Even where a claim arising from earlier conduct is time-barred, moreover (for example, because the complainant knew or should have known at the time that the conduct was discriminatory), “a ‘plaintiff who has a seasonable claim may use events that occurred prior to the six-month limitation period as background evidence . . . even though she cannot recover damages for the time-barred events.’ ” Id. at 647, quoting Cuddyer, 434 Mass. at 530.
E. Count I (Sexual Harassment and Gender Discrimination)
Count I, asserted against the DOC and Rice,[7] asserts that the defendants’ conduct constituted sexual harassment and gender discrimination, and that because Chaffee brought it to her supervisors’ attention, the DOC is liable. There are fatal difficulties with the claims against both defendants.
1. Claims Against the DOC
One is that Chaffee’s harassment by her primary tormentors, Jones and Waldron, had (so far as the record shows) ceased well before September 10, 1999. Nor is there a sufficient nexus between this time-barred conduct and any “anchoring” conduct during the limitations period to bring the continuing violation doctrine into play. Specifically, the evidence does not support Chaffee’s assertion that the investigation and disciplinary proceeding concerning her contacts with inmates was triggered by, or had any logical relationship to, the pre-limitations conduct of Jones and/or Waldron or anything that the DOC did or failed to do in response to it. See Ocean Spray, 441 Mass. at 642 (continuing violation doctrine does not apply where “the alleged timely discriminatory acts” lack the required “substantial relationship to the alleged untimely discriminatory acts”).
I note also that the federal courts have generally held that a discriminatory act committed by one entity or individual within the limitations period does not “anchor” an earlier discriminatory act by a different individual, at least absent some demonstrable causal connection between the two. See, e.g., Crosland v. City of New York, 140 F.Sup.2d 300, 308 (S.D.N.Y. 2001); Dunn v. Mendoza, 980 F.Sup. 197, 200 (N.D.Miss. 1997); Lawton v. State Mutual Life Assurance Co. of America, 924 F.Sup. 331, 340 (D.Mass. 1996); McK *155 enney v. New York City Off-Track Betting Corp., 903 F.Sup. 619, 622 (S.D.N.Y. 1995); Kearney v. Pyramid Management Group, No. 98-CV-00531E(Sc), 2000 WL 744000, at *6 (W.D.N.Y. June 5, 2000). Although there does not appear to be any Massachusetts case directly on point, this approach seems appropriately respectful of the SJC’s caution, in Ocean Spray, that the continuing violation doctrine should not be applied so as to “eviscerate the purpose of a statutory limitations period, and permit what should be a limited exception to such a stricture to swallow it whole,” 441 Mass. at 645, and I follow it here.
While Jones and/or Waldron might have been the source of the anonymous reports that led to the investigation, there is no evidence of this; connecting the post-limitations disciplinary conduct to Jones and Waldron would amount to speculation and nothing more.
Chaffee’s transfer to tower duty occurred a month before the limitations period commenced, and is similarly unrelated to any post-limitations anchoring event.
The anonymous telephone calls, mailing, and internet posting (some pre- and some post-September 10, 1999) might have been the work of Jones and/or Waldron, or of others; as with the anonymous reports, the evidence does not permit a finding either way. Nor would the evidence support a finding that the DOC’s investigation of these incidents was inadequate, or that its failure to identify the culprit(s) was due to gender bias.
Concerning the events on and after September 10, 1999, Chaffee makes no showing that the DOC’s investigation of her, the disciplinary hearing, or the sanction were motivated by gender bias; indeed, she conceded in the hearing that she had failed to report inappropriate contacts with inmates and their families, and she conceded in her deposition that some discipline was warranted (and had no position as to whether the fifteen-day suspension she ultimately received was unduly harsh).[8]
The incident in 2000 in which a copy of the investigation report was, it later developed, the inadvertent act of Chaffee’s own union representative, whose actions — even if they could be chalked up to gender bias — cannot be attributed to the DOC.
Finally, Chaffee’s assertion that Mark McCaw offered to transfer Inmate Sullivan to a minimum security prison in exchange for perjured testimony is based solely on a hearsay statement by Sullivan that cannot, under Rule 56(e), stand in the way of a properly supported motion for summary judgment.
2. Claims Against Rice
Before filing a civil action in this Court under Chapter 15IB, the employee must first file a Charge of Discrimination in the Massachusetts Commission Against Discrimination. G.L.c. 151B, §9; Green v. Wyman-Gordon Co., 422 Mass. 551, 557-58 (1996). “The purpose of the requirement is to provide the party with notice of a potential lawsuit and an opportunity to conciliate.” Butner v. Department of State Police, 60 Mass.App.Ct. 461, 468 n.14 (2004). “The failure to name a party in the complaint filed with the MCAD has been ruled to bar a plaintiff from later maintaining a G.L.c. 15IB claim in court against the party.” King v. First, 46 Mass.App.Ct. 372, 374-75 (1999), citing Powers v. H.B. Smith Co., 42 Mass.App.Ct. 657, 667 (1997).
Although no Massachusetts appellate case has squarely so held with respect to Chapter 15 IB, federal cases interpreting 42 U.S.C. Title VII have deemed that statute’s analogous requirement that a charge first be filed in the EEOC is satisfied where the charge, although not formally naming a person or entity as a respondent, nonetheless gave notice of a claim against that party; for example, “where the named party acted as an agent of the unnamed party and the unnamed party had notice of, and participated in, the conciliation proceedings.” King, 46 Mass.App.Ct. at 374 (1999), citing Curran v. Portland Superintending Sch. Comm., 435 F.Sup. 1063, 1074 (D.Me. 1977); see also Butner, 60 Mass.App.Ct. at 468 n.14.
Other federal cases, in considering whether to permit a claim to go forward against a party not named as a respondent in EEOC proceedings, have looked to such factors as “whether the complaining party could ascertain through reasonable efforts the role of the unnamed party in the alleged discriminatory incident; whether the interests of the named party are similar to those of the unnamed party; whether the absence of the unnamed party from the administrative proceedings would result in actual prejudice to the unnamed party; and whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.” King, 46 Mass.App.Ct. at 375-75, citing McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 505 (1st Cir. 1996); Glus v. G.C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977).
Even under these federal cases, the claims against Rice would fail because neither Rice himself, nor any conduct fairly attributable to him, was mentioned in the Charge of Discrimination or in the amendment to it.[9] Count I must therefore be dismissed in its entirety.
F. Count II (Retaliation)
In order to establish a prima facie case of retaliation, a plaintiff must show “that [s]he engaged in protected conduct, that [s]he suffered some adverse action, and that ‘a causal connection existed between the protected conduct and the adverse action.’ ” Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004). An adverse employment action is one which “disadvantaged [her] in respect to salary, grade, or other objective terms and conditions of employment.” *156 MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996).
Count II alleges that the DOC’s investigation of, and disciplinary proceedings and sanction against, Chaffee constituted retaliation for her complaints concerning Jones, Waldron, and the various anonymous acts of harassment against her. She also sees retaliation in her transfer to tower duty, effected as part of the investigation in order to remove her from direct contact with inmates. Because these constituted a logical sequence extending into the limitations period, Count II is not barred by the statute of limitations.
Count II fails, however, on substantive grounds. I will assume, without deciding, that Chaffee has made out a prima facie case of retaliation.[10] The burden then shifts to the DOC to proffer a legitimate, non-re-taliatoiy justification for its actions. Mole v. University of Massachusetts, 58 Mass.App.Ct. 29, 39 (2003), rev’d on other grounds, 443 Mass. 582 (2004); see Azimi v. Jordan’s Meats, Inc., 456 F.3d 228, 242 (1st Cir. 2006).
This it has done. Plainly, upon receiving reports— even anonymous reports — that a correctional officer was engaging in sexual contact with inmates, the Superintendent would be highly remiss if she did not commence an investigation. Transferring Chaffee to a non-inmate-contact post while the investigation was pending seems, in the circumstances, equally prudent.
There is no admissible evidence[11] that the investigation was carried out inappropriately. Chaffee was, in fact, cleared of the most serious charges against her and was disciplined only for the relatively minor transgressions which she admitted. She concedes that discipline was warranted, and takes no position — and offers no evidence — that the sanction was disproportionate to the offense. There is no evidence, in other words, even remotely suggesting that the Department’s reasons for the investigation, the transfer, the disciplinary proceeding, and the sanction were pretextual. Count II therefore must also be dismissed.
G. Count III (Constructive Discharge)
Chaffee, who still works for the DOC at NCCI-Gard-ner, now concedes that she was never discharged, constructively or otherwise. Count III therefore will be dismissed.
ORDER
For the foregoing reasons, the defendants’ Motion for Summary Judgment is ALLOWED. Judgment to enter, dismissing the Complaint.

On February 16, 2006 a judge of the district court (Ostrach, J.), sitting by designation, allowed an unopposed motion for summary judgment and dismissed claims against defendants Jones and Waldron.

At least some of the letters were traced to an inmate, who later acknowledged having written them and recanted the allegations. He was disciplined on September 17, 1999 for lying.

Chaffee, in her summary judgment papers, speculates that “Jones and Waldron could have been the perpetrators” of various acts of anonymous, post-transfer harassment, and argues, “It is a question of fact for the jury.” No direct evidence, and no very compelling circumstantial evidence, points to Jones and Waldron, however. Jones and Waldron having been dismissed, the remaining question concerning them is whether the DOC failed to correct a hostile work environment of which it was on notice, and if so, whether this aspect of the case was timely brought.

Chaffee served the entire 20-day suspension in January 2000, and received five days’ pay back after the settlement.

At the time Chaffee filed with the MCAD, section 5 required that the Charge be “filed within six months after the alleged act of discrimination.” By amendment in 2002, this period was increased to 300 days, tracking the federal requirement for a claim under Title VII.

The Amended Complaint names Commissioner Maloney, but is clear that he is named in his representative capacity only; I have therefore referred to claims against the DOC. Count I also asserted claims against Jones and Waldron personally, but as noted above (footnote 2), these were previously dismissed on summaiy judgment. Finally, Count I purports to assert a claim against “John Doe,” who is described as “an unknown male employee of the Department of Correction.” Doe is not further identified in the record before me, and so will not be further discussed here.

Chaffee’s claim that the proceeding cost her 71 days in seniority suffers from the same problems, and one more: In her deposition, Chaffee explicitly “waive[d] as part of this litigation for all purposes any claim that she lost out on any job at the Department of Correction resulting from any loss of seniority.” (See transcript, pp. 127-28.)

I note in passing that like the allegation concerning McCaw, much of the conduct of which Chaffee accuses Rice appears in the record only through hearsay statements of others, inadmissible under Mass.R.Civ.P. 56(e).

Chaffee engaged in protected activity when she complained of Jones and Waldron’s harassment. See Morris v. Boston Edison, 942 F.Sup. 65, 69 (D.Mass. 1996); Proudy v. Trustees of Deerfield Acad., 19 M.D.L.R. 83, 88 (MCAD 1997). Whether or not her transfer to tower duty constituted an adverse employment action, her disciplinary proceeding and sanction certainly did; the DOC’s protestations that its actions were justified are irrelevant to this issue, but rather go to the employer’s burden of proffering a legitimate, non-retaliatory justification (see text below).
If there is a weak link in the prima facie case, it is in the causal connection between the protected activity and the adverse action. Chaffee’s complaints were to her immediate supervisor, Diane LeBlanc (who, the record is clear, was sympathetic). The investigation and transfer were initiated by the Superintendent, Lynn Bissonnette. There is no direct evidence that Bissonnette knew of Chaffee’s complaints (see Mole, 443 Mass. at 598-600), but it seems a reasonable inference that she did. Far less reasonable is the suggestion that but for a retaliatory motive, Bissonnette would have decided not to investigate allegations that Chaffee had engaged in sexual contact with inmates. See the discussion, in text below, concerning the DOC’s proffer of a non-retaliatory justification.

As noted in the text above, Chaffee’s allegation that Investigator McCaw attempted to procure perjured testimony against her is based solely on a hearsay statement from an inmate.